# EXHIBIT 1

| | |
|---|---|
| **ARAPAHOE COUNTY DISTRICT COURT**<br>7325 S Potomac Street #100<br>Centennial, Colorado 80112<br>(303) 645-6600 | DATE FILED<br>December 23, 2025 12:05 PM<br>FILING ID: 6E96734A1CC80<br>CASE NUMBER: 2025CV33142 |
| **Plaintiff:**<br>**MOTHER DOE** as parent and legal guardian on behalf of **MINOR DOE,** a minor child**;**<br>**MOTHER DOE,** in her individual capacity**.**<br><br>**v.**<br><br>**Defendants:**<br>**LYFT, INC.;**<br>**META PLATFORMS, INC.** and **INSTAGRAM, LLC** | ▲ **COURT USE ONLY** ▲ |
| **ATTORNEY(S) FOR PLAINTIFFS:**<br>David K. TeSelle, Reg. No. 29648<br>Stephen J. Burg, Reg. No. 36789<br>Morgan L. Carroll, Reg. No. 31941<br>Jessica B. Prochaska, Reg. No. 46319<br>Halli E. Berrebbi, Reg. No. 62383<br>**Burg Simpson Eldredge Hersh & Jardine, P.C.**<br>40 Inverness Drive East<br>Englewood, Colorado, 80112<br>Phone No.: (303) 792-5595<br>Fax No.:    (303) 708-0527<br>E-Mail:        dteselle@burgsimpson.com<br>                    sburg@burgsimpson.com<br>                    mcarroll@burgsimpson.com<br>                    jprochaska@bursimpson.com<br>                    hberrebbi@burgsimpson.com | **Case No.:**<br><br><br>**Division:** |
| **COMPLAINT AND JURY DEMAND** ||

COME NOW, Plaintiffs MINOR DOE and MOTHER DOE by and through their attorneys BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C., and hereby submits their Complaint and Jury Demand against Defendants META PLATFORMS, INC. ("META"); **INSTAGRAM**, LLC; ("**INSTAGRAM**"), and LYFT, Inc. ("LYFT") and allege as follows:

## PARTIES

1. **Plaintiff MOTHER DOE** is the mother and legal custodian of minor child, **MINOR DOE**, and is filing this Complaint on behalf of her minor daughter and in her own individual capacity.   **MOTHER DOE** is currently a resident of the State of Colorado, Arapahoe County.[1]

2. **Plaintiff MINOR DOE** was thirteen (13) years old at the time she was groomed by a sexual predator using a fake **INSTAGRAM** account and transported unaccompanied to and from a kidnapping, drugging and violent sexual assault by two different **LYFT** drivers in violation of Lyft's own policies. **MINOR DOE** is currently a resident of the State of Colorado, Arapahoe County.[2]

3. **Defendant META PLATFORMS, INC. d/b/a Meta ("META"),** formerly known as Facebook, Inc. and The Facebook, Inc., is a multinational technology company incorporated in Delaware, with a principal place of business in Menlo Park, California. For purposes of this Complaint, Meta includes its wholly-owned subsidiaries **INSTAGRAM**, LLC; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc.; Meta Platforms Technologies, LLC; and Siculus, Inc.   **META** is the controlling parent company of **INSTAGRAM, LLC** and offers services to and conducts significant business with Colorado residents.

4. **Defendant INSTAGRAM, LLC ("INSTAGRAM"** or **"IG"),** is a limited liability company incorporated in The State of Delaware with its principal place of business in Menlo Park, California. **META** purchased **INSTAGRAM** on April 9, 2012 and **INSTAGRAM**, since then, is a wholly-owned subsidiary of **META**. Defendant **INSTAGRAM**, LLC offers services to and conducts significant business with Colorado residents.

---

[1] See contemporaneously filed Motion to Proceed under Fictitious Name. Plaintiff **MOTHER DOE** proceeds anonymously because revealing her identity would reveal the identity of her minor daughter.  The privacy interests in her proceeding anonymously outweighs the presumption of openness in judicial proceedings because of the highly sensitive and personal nature of this matter and because explicit death threats pose a risk of retaliatory harm to Plaintiffs.

[2] See contemporaneously filed Motion to Proceed under Fictitious Name. Plaintiff **MINOR DOE** proceeds anonymously because she is a minor and her privacy interests in her proceeding anonymously outweighs the presumption of openness in judicial proceedings because of the highly sensitive and personal nature of this matter and because explicit death threats pose a risk of retaliatory harm to Plaintiffs.

5. **Defendant LYFT, Inc. ("LYFT")** is incorporated in the State of Delaware and has a principal address located at 185 Berry Street, Suite 400, San Francisco, California 94107. LYFT's registered agent, CT Corporation System, is located at 7700 E. Arapahoe Road, Suite 220, Centennial, Colorado 80112-1268. Defendant **LYFT** offers services to and conducts significant business with Colorado residents.

## JURSDICTION AND VENUE

6. **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to the Constitution of the State of Colorado, Article VI, Section 9 and is a court of general jurisdiction to hear and resolve state claims for torts committed and injuries sustained in the State of Colorado.

7. **Personal Jurisdiction – INSTAGRAM, LLC.** This Court has personal jurisdiction over Defendant **INSTAGRAM** based on Defendants operations and presence in Colorado, by its transacting business in or directed at Colorado, by its commission of one or more tortious acts that caused injury and damages in Colorado, and/or by otherwise purposefully availing itself of the benefits and privileges of Colorado law by regular, continuous, and systematic contacts with Colorado. **INSTAGRAM, LLC** is a wholly owned subsidiary of **META PLATFORMS, INC.** *See* C.R.S. § 13-1-124(a) and (b).

    a. Of the estimated 1.3 million youth in Colorado[3], an estimated 90% have **INSTAGRAM** accounts, purposefully reaching approximately 1.1 million youth accounts in the State of Colorado.[4]

        i. Among those, an estimated 261,746 - 300,161 Colorado 13–17-year-olds actively use **INSTAGRAM** every day.[5]

        ii. An estimated 349,770–410,981 Colorado 13–17-year-olds actively use **INSTAGRAM** per month.

    b. Over half[6] of Colorado's 4.4 million adults[7], have an **INSTAGRAM** account purposefully reaching over 2 million adult accounts in the State of Colorado.

---

[3] Colorado State Demographer, U.S. Census
[4] Pew Research Center: Teens, Social Media & Democracy, 2024
[5] Colorado Attorney General, U.S. District Court for Northern District of California, Amended Complaint for Injunctive and Other Relief, 4:23-cv-05448-YGR, Doc. 207, ¶80.
[6] Pew Research Center, *ibid*
[7] Colorado State Demographer, U.S. Census, *ibid*

    c. **INSTAGRAM** purposefully advertises in Colorado, recruits and hires influencers in Colorado, and maintains a major office hub in Colorado.

    d. **INSTAGRAM**'s algorithm paired a Colorado sex offender with a Colorado minor who was repeatedly and violently sexually assaulted in Colorado.

8. **Personal Jurisdiction - META PLATFORMS, INC.** This Court has personal jurisdiction over Defendant **META** based on Defendant's operations and presence in Colorado, by its transacting business in or directed at Colorado, and by its commission of one or more tortious acts that caused injuries and damages in Colorado, and / or by otherwise purposefully availing itself of the benefits and privileges of Colorado by regular, continuous, and systemic contacts with Colorado. *See* C.R.S. § 13-1-124(a) and (b).

    a. **META** has an estimated 100 employees in a downtown Denver office and regularly recruits and hires talent from Colorado.

Learn more about teams in Denver



397 Positions

Software Engineering

→ More info

119 Positions

Infrastructure

→ More info



60 Positions

Technical Program Management

→ More info

    b. **META**'s headquarters in Denver is located at 900 16th Street and supports approximately 1,200 employees in the State of Colorado, including hybrid *and* remote work. [8]

---

[8] Meta's Denver site strives to be a worker hub amid company upheaval - Denver Business Journal

4

    c.   The Denver Hub for **META** is crucial for managing its worldwide physical network, controlling fiber lines, and supporting connectivity through META's global network.



A ski lift hangs in a corner of the mini-kitchen at Meta HQ Denver on Oct. 31, 2022, in Denver.
SETH MCCONNELL | DENVER BUSINESS JOURNAL

 **1 OF 13** 

    d.   **META**'s Denver office controls the physical infrastructure linking billions of people worldwide. While the main operations are in Silicon Valley, the Denver hub the spine that links the people who are connecting on Meta Platforms.[9]

    e.   The head of the Denver office, Steve Politis, is also **META's Director of Network Planning.**

    f.   **META** chose to build its own network, Politis said, because "we don't like to be surprised." And it chose Denver because of the network expertise here. Qwest Communications, Level 3 Communications, and the Zayo Group, along with other

---

[9] https://www.denverpost.com/2022/10/24/denver-meta-facebook-technology-telecom-jobs/

Colorado companies, helped build and manage fiber optic networks used by **META** around the globe. Steve Politis himself is a Colorado School of Mines graduate.

g. **META** earned over $63.4 billion[10] in revenue from the United States and Canada in 2024, including significant revenue from the State of Colorado.

h. **META** controlled all of the decisions and conduct of **INSTAGRAM** that led to the matching and introduction of a Colorado sex offender with a Colorado minor who was repeatedly and violently sexually assaulted in Colorado.

9. **Personal Jurisdiction – LYFT, INC.** This Court has specific personal jurisdiction over Defendant **LYFT** based on **LYFT**'s operations and presence in Colorado, by its transacting business in or directed at Colorado, by its commission of one or more tortious acts that caused injury and damages in Colorado, and/or by otherwise purposefully availing itself of the benefits and privileges of Colorado law by regular, continuous, and systematic contacts with Colorado. *See* C.R.S. § 13-1-124 (a) and (b).

a. **LYFT** has thousands of drivers in the State of Colorado and approximately 2 million drivers in the United States and Canada.

b. **LYFT** has tens of thousands of riders or users in Colorado and approximately 24.7 million nationwide.

c. **LYFT** has had one or more office locations in Colorado, including 1401 Zuni Street in Denver and a driver hub in Aurora.

d. **LYFT** advertises to Colorado consumers to use **LYFT**'s services in these Colorado cities: Aspen, Aurora, Boulder, Breckenridge, Centennial, Colorado Springs, Fort Collins, Fountain, Grand Junction, Loveland, Steamboat Springs, Telluride, Vail, and Winter Park.

e. **LYFT** has employees and independent contractors in Colorado.

f. **LYFT** provided two Colorado drivers to provide rides to an unaccompanied minor in Colorado, to and from a Colorado sex offender who repeatedly and violently sexually assaulted **MINOR DOE** in Colorado.

---

[10] investor.atmeta.com

10. **Venue** is proper in this Court pursuant to C.R.C.P. 98(c) because the incident which gave rise to this Complaint occurred in both Arapahoe County and in the City and County of Denver and Defendants apps were engaged in these same counties.

11. **Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021.** Plaintiffs have not consented to waive her right to trial by jury or to forced arbitration. Congress enacted the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 prior to this incident (*See* 9 U.S.C. §402) and consistent with the bipartisan intent of Congress, Plaintiffs wish to enforce their rights in Court to be determine by a jury.

12. **Choice of Law.** Colorado clearly has the most significant relationship regarding all issues involved. Further, Plaintiffs have not consented or waived to any choice of law and their safety and safety of others like them is a fundamental policy of the forum state as evidenced by C.R.S. §6-1-731.5. The most significant relationships to the occurrences underlying this suit were all in Colorado, including but not limited to: (1) where Plaintiffs resided; (2) where both Lyft rides occurred to and from the assault; (3) where the **INSTAGRAM** "matched" **MINOR DOE** with assailant; (4) where **MINOR DOE** was assaulted; (5) where Defendants advertised and marketed in Colorado; and where (6) medical treatment has occurred.

## **GENERAL ALLEGATIONS**

### ***MINOR DOE was groomed, kidnapped, drugged, strangled, and violently sexually assaulted for 18 hours by an adult sex offender recommended to her by INSTAGRAM and was personally delivered to the sex offender by LYFT***

13. This action seeks to vindicate the rights of Plaintiff **MINOR DOE**, who was a thirteen (13) year old girl, who was groomed, lured, kidnapped, drugged and violently sexually assaulted for 18-hours by an adult sexual predator using the **INSTAGRAM** and **LYFT** apps on or about November 14, 2024, and her mother, Plaintiff **MOTHER DOE.**

14. **MOTHER DOE** brings claims on behalf of her minor daughter, **MINOR DOE,** and on behalf of herself for the torts committed and the injuries and losses resulting therefrom.

15. **MINOR DOE** used the **INSTAGRAM** app to post pictures, communicate with friends, and accurately presented herself on the app as a thirteen (13) year old girl.

16. **MINOR DOE** used her real name and posted real photographs of herself, obviously a minor, on her **INSTAGRAM** account.

17. **MINOR DOE** was recommended a profile on **INSTAGRAM** for a user who appeared by be a teenage boy named "Doug" by **INSTAGRAM**'s meticulously designed algorithm.

18. In his profile picture, "Doug" appears roughly 15 years old.

19. This turned out to be a fraudulent account, as "Doug" was actually a 28-year-old man using doctored photos from other sources. The assailant was able to manage and maintain one or more **INSTAGRAM** accounts of different ages, despite a public and known prior history of sexual assault against children.

20. **MINOR DOE** had never met "Doug" in person prior to the incident and thought she was going to meet a fellow teen when she left her home after midnight on November 14th, 2024.

21. In the early morning hours of November 14, 2024, the man pretending to be "Doug", used his (obviously) fake **LYFT** account, registered under the name "Frank Frank", to order a ride to pick up the unsuspecting **MINOR DOE** and transport her from her residence to his residence.

22. **MINOR DOE** jumped from a window on the side of her house away from **MOTHER DOE**'s external security cameras, per the assailant's instructions, and met **Lyft Driver #1** on a corner near her house at 12:54am.

23. **Lyft Driver #1** responded to the ride request from the obviously fake account of "Frank Frank" which had a Lyft Profile picture showing an obviously adult male. Yet, in the middle of the night, the Lyft Driver ignored clear warning signs and picked up the unaccompanied **MINOR DOE** – a petite thirteen (13) year old girl still in her pajamas and only carrying her *Hello Kitty* blanket.

24. **LYFT** Driver #1 was given instructions by the assailant under the obviously false profile of "Frank Frank" to pick up / drop off **MINOR DOE** "out of view" where she could not be publicly seen - an obvious red flag, which was ignored.

25. **Lyft Driver #1** accepted the ride without any questions and dropped off unaccompanied **MINOR DOE** at the assailant's house at 1:09am without checking to see if she was alright, waiting for her to go inside, or reporting the incident to LYFT or to law enforcement.

26. **Lyft Driver #1** delivered **MINOR DOE** to a sex offender's home located in Denver, Colorado, where **MINOR DOE** was drugged, repeatedly violently sexually assaulted, strangled, threatened, and photographed for hours.

27. When the assailant answered the door, **MINOR DOE** realized that she was in trouble but had no means of escaping. He brought her inside and made her drink "weird" water, that

was hazy. The water contained a cocktail of drugs, including eye drops, benzodiazepines, and cocaine which caused **MINOR DOE** to quickly lose consciousness, have seizures, and urinate herself.

28. **MINOR DOE** awoke a short time later and realized that all of her clothes had been removed, was pinned down and the assailant was on top of her sexually assaulting her. **MINOR DOE** was locked in the apartment with a violent child sex offender, who went by "Frank Frank" on **LYFT** and "Doug" on **INSTAGRAM**, using the **INSTAGRAM** handle "FatMike710". The assailant's legal name is not Frank, Doug, or Mike, yet neither **LYFT** nor **INSTAGRAM** flagged these accounts prior to the assault of **MINOR DOE**.

29. **Lyft Driver #1** failed to follow **LYFT**'s policies against transporting unaccompanied minors and did not report the young girl alone in pajamas. Instead, he deposited her at the assailant's apartment at approximately 1:09am on November 14, 2024.

30. **LYFT** never trained, supervised or enforced its policies against transporting unaccompanied minors, such as **MINOR DOE.**

31. **MINOR DOE** suffered significant physical and emotional injuries during and after the assault that will impact her for the rest of her life as a result of **INSTAGRAM** and **LYFT**'s conduct, design choices and negligence.

32. **MINOR DOE** thought she was going to die, and tried to leave her underwear, fingerprints and any other evidence she could think of at the scene. [11]

33. The sexual assault on **MINOR DOE** was incredibly violent and prolonged. She was brutally penetrated multiple times throughout the 18-hour attack. The assailant only provided more drugged water and never gave **MINOR DOE** food or medical care. She suffered multiple seizures and was in and out of consciousness, disoriented, bleeding, and in incredible pain, despite the drugs. **MINOR DOE** truly believed she would die in his apartment.

34. **MINOR DOE** had an unknown number of seizures in response to the cocktail of date rape drugs that were confirmed in toxicology, including benzodiazepines (sedative), cocaine,

---

[11] **MINOR DOE** attempted to leave evidence at the scene, but assailant was evicted and the apartment was cleaned out before police could gather the evidence she left.

tetrahydrozoline (eye drops), and tetracyclic (antidepressant that causes drowsiness), all of which can cause long term physical damage, especially for a child.

35. While briefly conscious after a seizure, she recalled the assailant making a panicked phone call on why "this one" was having a different reaction to "the usual dose" of drugs (suggesting *he had done this before to other Colorado children*).

36. The assailant took many pictures of **MINOR DOE** during the assault and ordered her to pose for more photographs while she was conscious during the 18-hour ordeal. He informed **MINOR DOE** that she now "worked for him", suggesting that the assailant was part of a larger network of pedophiles or sex traffickers and had a way to monetize the photographs of **MINOR DOE**'s assault, possibly through **INSTAGRAM**.

37. Meanwhile, after being awoken by another family member, **MOTHER DOE**, in a panic, realized her daughter was missing, and immediately called 911 to report the disappearance of **MINOR DOE** to the Arapahoe and Denver Police Departments, and a search for **MINOR DOE** ensued.

38. **MINOR DOE** had left behind all electronics (including a cell phone and laptop), making it difficult for law enforcement to locate her. She only took the pajamas she was wearing and her *Hello Kitty* blanket to keep warm, per "Doug's" instructions.

39. **MOTHER DOE** was able to use **MINOR DOE**'s laptop to force a password reset for **MINOR DOE**'s **INTSTAGRAM** account, thereby preserving her side of the conversation with "Doug" on the app.

40. The assailant deleted his **INSTAGRAM** account for "Doug" while **MINOR DOE** was still kidnapped and in his custody. He tried to force **MINOR DOE** to log in and delete her side of the conversation, too, but was unable to do so because **MOTHER DOE** had already forced a password reset and **MINOR DOE** could not get into her account, thus preserving at least half of the conversation for law enforcement.

41. The assailant threatened to kill **MINOR DOE** *and her family* if she ever resisted or reported him or the assault to anyone, as he had knowledge of her family members through her **INSTAGRAM** account and their messages. **MINOR DOE** was terrified that the assailant or his friends would harm **MOTHER DOE** or her other family members, and did her best to obey and convince the assailant of her silence.

42. The assailant told **MINOR DOE** he would only release her back if she never told because "he didn't want to have to bury her body."

10

43. Only after **MINOR DOE** assured the assailant convincingly that she would never report the incident and promised to follow all of his instructions, did the assailant finally hail a second **LYFT** to take **MINOR DOE** back home, in Arapahoe County.

44. The assailant used the same obviously fake **LYFT** account of "Frank Frank" with the same obvious profile photo of an adult man to hail a **LYFT** ride and *instruct* **Lyft Driver #2** to pick up and drop off unaccompanied **MINOR DOE** out of view of neighbors and cameras.

45. At 7:57pm on November 14, 2024, the assailant ordered a second **LYFT** ride to return **MINOR DOE** to her home. She was bruised and bleeding from her multiple complex injuries, still under the influence of the drugs he made her take, suffering cognition and motor issues from the multiple seizures, and was once again a clearly unaccompanied child in pajamas with a blanket as her only possession.

46. Despite the fact that **MINOR DOE** was clearly underage, drugged, and seriously physically injured, and the fact that they were given instructions to drop her off out of sight, **Lyft Driver #2** did not decline the ride or report the incident, as is required per **LYFT**'s written policies.

47. Meanwhile, **MOTHER DOE** was in a panic searching for her daughter, pleading with law enforcement for help, and trying to uncover all clues she could to her daughter's whereabouts, unable to confirm if her daughter was alive or dead.

48. **Lyft Driver #2** returned unaccompanied **MINOR DOE**, drugged, bloody, and wrapped in her *Hello Kitty* blanket. A neighbor was able to capture the license plate of **Lyft Driver #2** when he dropped her off at 8:21pm near her home.

49. Upon returning home, **MINOR DOE** was frightened by the police presence and refused to speak about what happened.

50. **MINOR DOE** was still terrified by the assailant's threats, and she did not want to talk to the police for fear that the assailant would kill her, **MOTHER DOE**, or another family member.

51. The assailant has knowledge of **MINOR DOE**'s family members from her **INSTAGRAM** profile and her private conversations with "Doug" and used this knowledge to threaten **MINOR DOE**.

52. **MOTHER DOE** was beside herself with worry and relief as both **MOTHER DOE** and **MINOR DOE** thought **MINOR DOE** could have been killed. Both **MOTHER** and **MINOR DOE** recognize that **MINOR DOE** barely escaped with her life.

11

53. After a brief reconciliation, **MINOR DOE** and **MOTHER DOE** were immediately transported to the hospital by ambulance with police. **MINOR DOE** was too shaken up to proceed with a SANE exam during that visit, but her immediate injuries were treated and **MINOR DOE** was stabilized.

54. The next morning, November 15, 2024, when **MINOR DOE** was still in the hospital, they completed her SANE exam attended by **MOTHER DOE** with nurse Jennifer Barrett and **MINOR DOE** and was not released from the hospital until the evening of November 15, 2025.

55. **MINOR DOE** completed a forensic interview with Cori Harris at the Denver Children's Advocacy Center a week later.

56. After receiving treatment, **MINOR DOE** felt safe enough to share what happened to her, and she identified her assailant from a photo line-up provided by the Denver Police Department.

57. Detectives put in an urgent request for **MINOR DOE**'s rape kit, which came back as a match to assailant, who was already in the system. He is currently in custody.

58. Now over a year after the incident, **MINOR DOE** is still undergoing physical therapy, counseling, and taking medication as a result of the drugging and violent sexual assault.

59. **MOTHER DOE**, **MINOR DOE**, and their whole family were forced to move their home, as the assailant knows their address, and **MINOR DOE** is terrified he or his friends would kill her and or a family member.

60. **MINOR DOE** and **MOTHER DOE** remain in fear to this day that assailant will follow through on his promise to kill them if anyone found out, as he as in pre-trial custody but has not yet been tried and convicted and he has contacts outside of prison.

61. **MINOR DOE** was unable to attend school for several months after the ordeal and still struggles with attendance, social interactions, and maintaining her grades due to her injuries and trauma.

62. **MINOR DOE** has been in continuous and regular physical therapy and psychological counseling since the incident.

63. **MINOR DOE** and has experienced serious disruption to her life, her education, her sense of personal safety, and her social life. Her life will never be the same. She has experienced PTSD, anxiety, depression, and repeated thoughts of suicide since the incident.

64. **MOTHER DOE** has lost wages due to the need to prioritize **MINOR DOE'S** treatment, rehabilitation, and recovery and because she was under such acute emotional distress grieving for her daughter's lost childhood that it was difficult to do her usual work.

65. **MOTHER DOE** has tried to keep her composure and be a source of strength for **MINOR DOE,** but when speaking about the trauma of this whole experience, she cannot do so without becoming tearful and re-experience her own sense of deep and profound pain and loss.

66. **MOTHER DOE** entered counseling for herself to manage her own trauma and to make sure she can continue to support **MINOR DOE** in any way possible.

67. Even before **MINOR DOE** was recommended to connect with the "Doug" account by **INSTAGRAM**, she had experienced a noticeable decline in mental health that correlated with her creating an **INSTAGRAM** account at the age of 11, when she was still in 6th grade.

68. **MOTHER DOE** noticed that her daughter was losing weight, withdrawing from family, keeping secrets, and falling behind in school.

69. **MOTHER DOE** was not aware that **MINOR DOE** had an **INSTAGRAM** account until her disappearance on November 14, 2024, when **MOTHER DOE** searched **MINOR DOE**'s laptop and found the conversation with "Doug".

70. **MINOR DOE** had been in treatment since January, 2024 for a suicide attempt, self-harm, and an eating disorder, all of which began around the time **MINOR DOE** created her **INSTAGRAM** account, making her even more vulnerable to grooming.

71. **MINOR DOE** created the **INSTAGRAM** account to fit in at school, since almost all of her classmates used **INSTAGRAM** as their primary form of communication and socialization.

72. After creating her **INSTAGRAM** account, which used her real name and photos, **MINOR DOE**, like other teens, was exposed to increasingly disturbing content, such as posts showing self-harm, motivation for eating disorders, sexual content, and fake profiles.

73. **MOTHER DOE** began to notice cuts that **MINOR DOE** could not explain, and did not realize what was happening, since she was unaware of "cutting" (deliberately cutting oneself for relief from depressive thoughts, made popular by social media).

74. **MINOR DOE**, already small for her age, began to lose weight at an unhealthy rate, much to the distress of **MOTHER DOE**.

13

75. Even more distressing, on January 10, 2024, **MINOR DOE** attempted to take her own life – a known and alarming trend among children on **INSTAGRAM**[12]

76. Once **MINOR DOE** recovered at the hospital, **MOTHER DOE** sought immediate treatment for **MINOR DOE**'s mental health issues, and she had made significant improvements before the incident.

77. Because **MOTHER DOE** was not aware of her young daughter's **INSTAGRAM** account, and does not have an **INSTAGRAM** account of her own, she could know what harmful content was fueling **MINOR DOE**'s sudden decline in mental health.

78. Parental consent is not required for 13-year-olds using **INSTAGRAM**.

79. If **INSTAGRAM** had enforced its own safety policies, designed functional safety features, cracked down on fake accounts, and ensured their algorithms were safe for minors, *this never would have happened*.

80. If **LYFT** trained their drivers or enforced their policy against accepting rides transporting unaccompanied minors, and cracked down on fake rider accounts, *this never would have happened*.

81. **MINOR DOE** has been treated for severe mental health and physical consequences from this incident, has physical and psychological injuries, lost future earning capacity, and sustained other significant noneconomic damages.

82. **MOTHER DOE** has been treated for her own mental health consequences from this incident and has psychological injuries, lost past wages, increased out of pocket costs and losses, lost future earning capacity, and sustained other significant noneconomic damages.

83. **MOTHER DOE** and **MINOR DOE** bring this action to hold **META**, **INSTAGRAM** and **LYFT** accountable for their roles in matching and delivering **MINOR DOE** to a known sexual predator and want to ensure this does not happen *ever again* to any more children or parents.

## THE ROLE OF INSTAGRAM AND META

***Despite false safety assurances, META and INSTAGRAM recommended and connected an adult convicted sex offender with MINOR DOE who abducted, drugged, strangled and violently sexually assaulted her.  META and INSTAGRAM purposefully targeted underage***

---

[12] https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

***children, including MINOR DOE, with deliberately designed addictive products, that they
knew caused and increased mental health problems in children, making them more
susceptible to grooming***

84. **META PLATFORMS, INC.** is the parent company that owns and controls its subsidiary, **INSTAGRAM, LLC**.

85. **INSTAGRAM, LLC** is the immediate software and platform that connected **MINOR DOE** with a sex offender, but the main **DECISIONS** and priorities of what to design and where to invest come from the parent company, **META.**

86. **META** and **INSTAGRAM** intentionally, recklessly and knowingly:

   a. targeted minors with their products, including **MINOR DOE.**

   b. designed them to be addictive, including to **MINOR DOE.**

   c. had actual knowledge of adults regularly propositioning children regarding drugs and sex, including to **MINOR DOE.**

   d. had actual knowledge of problems with fake accounts, and

   e. chose not to take reasonable remedial measures recommended by their own Integrity and Wellbeing teams (**INSTAGRAM** created the Integrity and Wellbeing teams to tackle safety and design issues on the platform, including issues specific to children) that would have protected thousands of children, including **MINOR DOE.**

87. **MINOR DOE** was just eleven (11) years old when she first opened an **INSTAGRAM** account.

88. **MINOR DOE** was able to open an **INSTAGRAM** account without age verification and without parental consent.

89. **META** and **INSTAGRAM** had a policy against children under the age of thirteen (13) from opening accounts but did not and does not enforce this policy.

90. This false statement is directed to parents, like **MOTHER DOE** under "Tips for Parents". [13]

---

[13] About https://help.instagram.com/ageverification

Default Instagram settings

Age Verification

We require people to be at least 13 years old to sign up for Instagram. People can confirm their age by providing their birthday, photo identification, and/or submitting a video selfie. **Confirming your age** is a requirement for everyone on Instagram. **You can learn more about age verification in Newsroom.**

91. By recommending **MINOR DOE** connect with "Doug" a previously convicted adult sex offender posing as a fellow teen, by algorithmically directing content to **MINOR DOE,** by creating intentionally addictive products to grow a user base, and by valuing profits over safety, **META** and **INSTAGRAM** put **MINOR DOE** in a vulnerable position and connected her with a sex offender who proceeded to commit the following crimes against **MINOR DOE:**

   a. Aggravated Sex Assault on a Child

   b. Violent Crime - Sex Offense

   c. Sex Assault - Under 15 - Force / Drug / Other

   d. Strangulation

   e. Second Degree Assault - Drugging of Victim

   f. Drugging Victim

   g. Enticement of a Child - Bodily Injury

92. Had **META** and **INSTAGRAM** not 'recommended' the Doug profile, but instead prevented, detected and removed the false account, blocked access to children's accounts, warned the child user, or conducted any screening or verification on users propositioning children, this never would have happened.

### ***META and INSTAGRAM owed a duty to MINOR DOE and MOTHER DOE.***

93. **INSTAGRAM** and **META** deliberately designed an addictive product, which brings with it a heightened duty, particularly when marketed and targeted to children, like **MINOR DOE**.

94. **INSTAGRAM** and **META** have a duty to protect **MINOR DOE**, from being presented with disturbing and unlawful content by **INSTAGRAM** and **META.**

95. **INSTAGRAM** and **META** have a duty to protect children, including **MINOR DOE** from being groomed and sexually assaulted through **INSTAGRAM**'s meticulously designed platform and algorithms.

96. **INSTAGRAM** is a social media platform owned by **META** that develops, designs, markets, and operates the **INSTAGRAM** website and app.

97. The **INSTAGRAM** app provides an online social media networking platform where users can share images and videos as well as interact with other users by leaving comments, reactions ("likes" and emojis) or sending direct private messages to other users.

98. The **INSTAGRAM** app, brand, features, controls, interface, recommendations, design, and content feed algorithm is wholly owned, operated, and controlled by **META.**

99. **INSTAGRAM** and **META** owe a duty to their users and the public, including **MOTHER DOE** and **MINOR DOE** such as (but not limited to):

   a. a duty to exercise reasonable care in the safety of its designs and features, particularly when deliberately targeting minors;

   b. a duty to exercise reasonable care in the truthfulness of its marketing and statements to **MINOR DOE**, **MOTHER DOE**, and the public at large;

   c. a duty to refrain from deliberately and knowingly programming addictive and harmful features to minors and a heightened duty to address and prevent the consequences from knowingly choosing those addictive features;

   d. a duty to provide truthful warnings about their known dangers and risks to minors from use of its product;

   e. a duty to prevent, detect and remove fake and deceptive account profiles targeting minors;

   f. a duty to require parental consent for children under thirteen (13) to open an account pursuant to COPPA 15 U.S.C. §6502(a)(1).

   g. a duty to enforce its own policies as it pertains to unlawful content, fake accounts, and targeting minors with drug deal propositions or sexual content; and

   h. a duty not to recommend minors follow or connect with fake profiles, sex offenders, or other strangers.

17

### *META and INSTAGRAM breached their duties to MOTHER DOE and MINOR DOE.*

100. **META** and **INSTAGRAM** breached their duties by:

    a. **knowingly creating an addictive product**, purposefully targeting minors, and serving minors harmful content such as content that is sexual, promotes eating disorders, promotes self-harm, and/or promotes suicide.

        i. **META** chose to hook teenagers by rewiring their brains, keeping them addicted to the platform and achieving **META**'s ultimate goal: growth and engagement.

        ii. **META** deliberately chooses features and designs that will gain new users and keep existing users as engaged as possible instead of prioritizing features and designs that would keep their users safe from the known harms caused by **META**, particularly on the **INSTAGRAM** platform.

        iii. **META** knows that the research shows harms are particularly damaging to young brains, including **MINOR DOE**'s.

        iv. Former employee, Chamath Palihapitiya, former Vice President of User Growth at **META** acknowledged "tremendous guilt" about his contributions to social media saying, "the short-term, dopamine-driven feedback loops that we have created are now destroying how society works."

    b. **actively serving up recommendations to minors** with content or profiles with fake accounts, adult strangers, sexual predators, drug dealers, and other high-risk connections with minors.

    c. **telling parents, children, and investors** that their product was safe for minors, when **META** knew it was not and is not safe.

    d. **not requiring parental consent for children using the platform,** and not warning parents or children of the inherent dangers

    e. **failing to prevent, detect, and shut down** fake accounts and profiles targeting minors.

    f. **recommending MINOR DOE connect with "Doug"** a fake account of an adult convicted sex offender.

### *META and INSTAGRAM have knowingly and consistently prioritized profits over safety.*

101. **META** and **INSTAGRAM** breached their duties by consistently underfunding **INSTAGRAM**'s "Integrity" and "Wellbeing" programs, which have to do with overall safety, design, algorithms, protections for minors, and community engagement problems such as vaccine misinformation, election integrity, child pornography, and human trafficking on **INSTAGRAM**, among other things.

102. A whistleblower wrote the CEO, Adam Mosseri, asking to raise Integrity to the *same level* of prioritization as product growth, indicating that "There are 4 things which Wellbeing team can and ready to do to reduce fake accounts and fake engagement. But it is not done due to *lack of priority and funding restrictions*."[14]

103. The same whistleblower goes on to say, "My personal opinion loss of trust is the greatest threat we have.  Left unchecked it will be crushing the company."



104. CEO Adam Mosseri responded that fake accounts are "user problems" and in doing so he was complicit in making it a problem for **INSTAGRAM** user **MINOR DOE** when she was recommended to, groomed by, and sexually assaulted by a convicted sex offender using a fake profile on an **INSTAGRAM** account.

105. CEO Adam Mosseri noted that **INSTAGRAM** did not have a "natural way to prioritize and fund integrity problems."[15]

---

[14] https://www.ftc.gov/legal-library/browse/cases-proceedings/191-0134-facebook-inc-ftc-v-ftc-v-meta-platforms-inc

[15] IIC = Inappropriate Interactions with Children; CEI = Community Engagement and Involvement, CT = Conspiracy Theories



From: Adam Mosseri
Sent: Monday, October 22, 2018 9:39 AM
To: ▓▓▓▓▓▓▓▓ <▓▓▓▓@instagram.com>
Subject: Re: need to prioritize Integrity efforts over growth - we must fight fakes

▓▓▓▓ thanks for reaching out and for putting this together. I agree fake accounts and fake engagement are important problems. I think one of the issues is they're not going to naturally rise to the top of the priority list for the Well-being team, even if that team were significantly bigger than it is, given how much more work we have to do for problems like IIC, CEI, CT, elections integrity, etc.

I do think though that fake accounts and fake engagement, though they are user problems, they present a bigger thread to the business than to the user experience. And we don't have a natural way to prioritize and fund business integrity problems — so I'm talking to Vishal, ▓▓▓▓▓ ▓▓▓▓ and ▓▓▓▓ about how we might carve out some resources to work on these types of issues next year.

106. And after receiving a dismissive reception, the whistleblower urges **META** and **INSTAGRAM** not to wait even another year to crack down on fake accounts, and asks that new features be implemented despite the minimal growth impact (meaning **INSTAGRAM** *decided* not to fix this problem, even though they could, because it would not gain new users or increase revenue).



From: ▓▓▓▓▓▓▓▓ <▓▓▓▓@instagram.com>
Date: Monday, October 22, 2018 at 10:19 AM
To: Adam Mosseri <▓▓▓▓@instagram.com>
Subject: RE: need to prioritize Integrity efforts over growth - we must fight fakes

Adam,
At the risk of sounding too pushy I would say it can not and should not wait for next year.
I understand that some of the listed items (like ReCapture 2.0) were implemented – but not put into Prod due to possible minimal growth impact.
So it maybe matter of prioritization and focus more than resources (which are also needed).

107. In an internal presentation titled Inappropriate Interactions with Children (**INSTAGRAM** uses the acronym "IIC" for this specific systemic problem. IIC includes adult sexual content that is recommended to children, sexual comments made by adults on children's posts and sexual messages sent by adults to children), **INSTAGRAM**'s own internal reporting demonstrated the lack of resources to implement meaningful safety measures for children on the platform.

## 2. Inappropriate Comments



108. In a July 2020 internal **META** chat one employee asked, "What specifically are we doing for child grooming (something I just heard about that is happening a lot on Tik Tok)?" The response received was "Somewhere between zero and negligible."

109. In August of 2020, one "integrity researcher" at **META** wrote an internal article [16] with her parting thoughts as she was leaving the company - **META**'s leadership consistently ignored concerns about user safety: "Integrity teams are facing increasing barriers to building safeguards."

110. "[T]ime and time again I've seen promising interventions from integrity products teams, with strong research and data support be prematurely stifled or severely constrained by key decision-makers." (*ibid*)

111. "Similarly (though even more concerning) I've seen already built & functioning safeguards be rolled back for the same reasons." (*ibid*)

112. A 2021 internal presentation on child safety included one slide stating that **META** is "underinvested in minor sexualization on IG, notable sexualized comments on content

---

[16] https://www.npr.org/2021/10/25/1049015366/the-facebook-papers-what-you-need-to-know

posted by minors.  Not only is this a terrible experience for creators and users, it's also a vector for bad actors to identify and connect with each other."

113. Screening out convicted sex offenders, child groomers, and fake accounts would hurt **META's** bottom line because, as stated in their 2023 Form 10-K[17], "**META** generates substantially all of [its] revenue from selling advertising placements on our family of apps to marketers.  ...[D]eclines in the size of our active user base may adversely impact our ability to deliver ad impressions, and, in turn, our financial performance."

114. Shortly after public whistleblower, Frances Haugen revealed how **META's** products harm children, a former **META** employee revealed in a five-page document that **META's** efforts to address the prevalence of CSAM (child sex abuse material) within its products were 'inadequate' and 'under-resourced'.

115. The whistle blower also stated that **META** doesn't track the full scale of the CSAM problem because senior executives consistently limit funds available for child protection design efforts, by instead focusing on the company's "return on investment." *(ibid)*

116. In addition, **META** has been accused of deliberately having child pornography and other illegal materials handled by third parties, so that **META** executives can claim "no knowledge" of this systemic problem.

117. In October of 2021, Francis Haugen, a data scientist who worked for **META**, turned over tens of thousands of pages of internal documents showing that **META** has long been aware that its platforms harm the mental health of teens and children.  However, **META** continued to make conscious decisions to prioritize profits over safety, including that of **MINOR DOE**.[18]

118. In December of 2023 the Associated Press reported in a story picked by Fortune that social media companies made $11 billion in the United States ad revenue from minors and therefore has 'overwhelming financial incentives' to avoid protecting children and keep them engaged with the platform, even if it harms them.[19]

119. Despite being well aware that teens will be exposed to sexualized content, unwanted messages, adult profiles, self-harm, violence, and suicide by their algorithms, **INSTAGRAM** still choses to priority growth over the safety of its many teen users.

---

[17] https://www.sec.gov/Archives/edgar/data/1326801/000132680124000012/meta-20231231.htm

[18] https://www.sec.gov/Archives/edgar/data/1326801/000121465922006855/j513224px14a6g.htm
[19] https://fortune.com/2023/12/27/social-media-us-ad-revenue-minors-harvard-study/

### *INSTAGRAM as it is designed and put out to market is an inherently dangerous product, particularly for minors.*

120. **INSTAGRAM** uses a unique algorithm to curate a "feed", which is provided in the form of content that users can scroll through endlessly (more content continues to generate as the user scrolls, there is no end or bottom of the page).

121. **INSTAGRAM** alone uses a uniquely designed algorithm to determine what content appears on a user's feed and determines which user-generated content appears on the feeds of other users.

122. **INSTAGRAM** alone uses a uniquely designed algorithm to recommend people and pages to users to increase their engagement with the platform.

123. **META** itself estimates 100,000 children using **INSTAGRAM** receive online sexual harassment *each day*, including "pictures of adult genitalia", according to documents made public during an investigation by New Mexico's Attorney General regarding **INSTAGRAM**'s safety for children.[20]

124. The New Mexico investigation revealed documents describing an incident in 2020 when the 12-year-old daughter of an executive at Apple was solicited by an adult man via IG Direct, **INSTAGRAM'S** messaging product.

125. "This is the kind of thing that pisses Apple off to the extent of threatening to remove us from the App store", a **META** employee fretted, according to the documents.

126. In testimony before the United State Congress, a former **META** employee described how his own teenage daughter had been solicited via **INSTAGRAM** and his efforts to fix the problem were ignored by **META**.

127. According to Zamaan Qureshi, co-chair of the online safety watchdog Design It For Us, "**META**'s persistent failure to protect young people from predators in **INSTAGRAM** reveals deep and dangerous flaws in its platform, one that stems from the unchecked power it holds as a social media monopoly."

128. A report titled Teen Accounts, Broken Promises – How **INSTAGRAM** is Failing to Protect Minors led by Arturo Bejar, Cybersecurity for Democracy, FairPlay, and others tested **INSTAGRAM**'s listed safety tools for teens on the platform.

---

[20] https://nmdoj.gov/press-release/attorney-general-raul-torrez-files-lawsuit-against-meta-platforms-and-mark-zuckerberg-to-protect-children-from-sexual-abuse-and-human-trafficking/

129. The Bejar report[21] noted that, "our testing of Teen Accounts and **META**'s safety tools found a combination of tools that were no longer functional, tools that were buggy, and tools that by their own design would not prevent the harm they claimed to address. In several cases, we found that **META**'s own design circumvented its own safety tools. These are all product design issues."





130. "Adults can communicate with minors through many features that are inherent in **INSTAGRAM**'s design. In many of these cases, the adult strangers were recommended to the minor by **INSTAGRAM**'s features: Reels, People to Follow, etc." *ibid.*

---

[21] https://fairplayforkids.org/wp-content/uploads/2025/09/Teen-Accounts-Broken-Promises-How-Instagram-is-failing-to-protect-minors.pdf

131. Most significantly, when a minor experiences unwanted sexual advances or inappropriate contact, **META**'s own product design **does not include an effective way for the teen report an unwanted advance.** *ibid.*

132. The conscious absence of a tool that captures this information creates a state of deliberately designed "willful blindness" for **META** and **INSTAGRAM**, meaning by design it is effectively impossible to document, manage, or reduce this harm.

133. **INSTAGRAM** has implemented an incentive for underage users to active Disappearing Messages, and rewards their use with an animation instead of a warning. Disappearing messages can be used for grooming, drug sales, and other illegal activities and leave the minor with no recourse after the messages vanish. (Bejar Report).

134. The report also found that while *some* "follow requests" sent directly from adult strangers to a child triggered a warning, **no warnings were shown when INSTAGRAM algorithmically recommended adult strangers for a teen to follow and engage with**.

135. The report found teenagers are unable to quickly or effectively report inappropriate or sexualized comments or messages they have received, including from adults. This is a **design choice** by **META** and **INSTAGRAM.**

136. **INSTAGRAM** does not vet or screen users before recommending their pages to other users, and there is no age verification.

137. As a result, **INSTAGRAM** was responsible for putting **MINOR DOE** in contact with a child sex offender, under the fake profile of "Doug".

### *INSTAGRAM directly targets vulnerable teens and knowingly addicts them to harmful content for profit.*

138. According to **META**'s own researchers:

   a. 13.5% of U.K. girls reported more frequent suicidal thoughts when using **INSTAGRAM**.

   b. 17% of teen girls reported worsening eating disorders after starting to use **INSTAGRAM**.

   c. Over 40% of **INSTAGRAM** users who reported feeling "unattractive" said that feeling began while using **INSTAGRAM**, and

   d. 32% of teen girls who already felt bad about their bodies felt even worse because of the app.

25

139. They also create a phenomenon that Meta employees refer to as "fee[d]ing the spiral."

140. Because of the structure of the defective algorithm powering features like Explore, "someone feeling bad sees content that makes them feel bad, they engage with it, and then their IG is flooded w[ith] it."

141. **META** recognizes that **INSTAGRAM** users at risk of suicide or self-injury, such as **MINOR DOE**, are more likely to "encounter more harmful suicide and self-injury content (through explore, related, follower suggestions, etc.)" because of the spiral of harmful content that **INSTAGRAM** curates for continuous engagement, positive or negative.

142. Because **META**'s algorithm prioritizes engagement above all else, any harmful feeling or impulse that users have are amplified by **INSTAGRAM**—which becomes an echo chamber screaming their most upsetting thoughts back at them.

143. **META** has been clear about the problem: for young users, "our recommendations algorithms will start pushing you down a rabbit hole of more egregious content."

144. Despite the knowledge that their algorithms, designed to generate as much engagement as possible, were actually harming children on **INSTAGRAM**, the executive team chose to prioritize growth over the safety of their young users, including **MINOR DOE**.

145. **META** already knew the solution: targeted changes to the algorithm do lead to a "meaningful drop in exposure" to problematic content. But they have been resistant to making such changes for the explicit, profit-minded reason that such tweaks "came with a clear engagement cost."

146. In short, harmful content generates more engagement. **INSTAGRAM** and **META** choose to continue delivering this harmful content to children, such as **MINOR DOE**, because it keeps them on the platform longer, allowing the platform to collect more data and present them with more advertisements.

147. To further drive user engagement (and thereby drive data collection and advertising revenue), **META** and **INSTAGRAM** also utilize a series of design features that are carefully calibrated to exploit users' neurobiology. These features work in tandem with algorithmic ranking to promote addictive engagement, and this is particularly effective with young brains.

148. **META** understands this: "teens tell us that they try to take a break but feel compelled back onto the app." But it does not warn prospective or current users about the safety risks, which are particularly harmful to adolescents and their parents, including Plaintiffs.

149. **INSTAGRAM** and **META** have recognized that their algorithms are structured to recommend "keywords" or "hashtags" to its young users that lead them to navigate to dangerous content.

150. One researcher put the matter directly in April 2021: "A recurring area of concern is that we are recommending keywords related to significant safety and wellbeing concerns e.g. weight loss, diet pills, appetite suppressants. We have been flagging these terms as they appear and Product Policy and Product teams have been sweeping the list of keywords to remove them, but this is not sustainable and remains a significant safety, policy, and comms risk. Our current approach of catching all potentially risky terms in a 'block list' has not helped us avoid two news cycles, and the possibility of this happening a third time is a significant comms and policy risk."

151. Interestingly, the "comms and policy risk" seem to be of *more* concern to executives than the actual wellbeing of **INSTAGRAM**'s teenage users.

152. As another set of **META** researchers acknowledged, the majority of negative experiences on **INSTAGRAM** come not from direct interactions with others (i.e., through comments or direct messages) but rather through **algorithmically generated recommendations**, via Explore, Feed, or hashtags.

153. "Problematic use is highest among teens and people in their 20s, consistent with previous findings that younger people generally have more problems with self-regulation."

154. Additionally, "problematic users" evidenced common tendencies, such as (a) accessing and spending more time on the platform; (b) using the platform late at night; (c) receiving more and responding more quickly to push notifications; (d) temporarily deactivating their account in the past; and (e) sending far more messages per minute with a higher ratio of messages sent to messages received.

155. As noted above, **META** understands that "teens feel addicted to **IG** and feel a pressure to be present" but "like addicts, they feel that they are unable to stop themselves from being on **IG**."

156. A study into **INSTAGRAM** user behaviors from that same year similarly found that "high time spent users do tend to be disproportionately younger users, and these users may warrant extra attention."

157. The study found that "[a]s time spent increases, we see a larger proportion of users that are high school, college or early work life-stages, with additional increases in high school when we zoom in on the top 1% of time spent users."

158. **META** knows that "problematic use" of **INSTAGRAM** leads to real problems to real people, including real children, like **MINOR DOE**.

159. In one internal company document, **META** acknowledged that the pressure to be present and obtain validation on **INSTAGRAM** meant that teens lacked the capacity to "switch off and shut down," noting that teens "can get addicted to things that make them feel bad."

160. One of **META**'s data scientists did not mince words when describing this phenomenon to their colleagues: "I worry that driving sessions incentivize us to make our product more

addictive, without providing much more value. How to keep someone returning over and over to the same behavior each day? Intermittent rewards are most effective (think slot machines), reinforcing behaviors that become especially hard to distinguish— even when they provide little reward, or cease providing reward at all."

161. Another **META** employee was clear-eyed that "little reward" was too charitable—and that addictive use was actively harming kids' mental health: "In the focus groups teens told us that they don't like the amount of time they spend on the app but feel like they have to be present. They often feel 'addicted' and know that what they're seeing is bad for their mental health but feel unable to stop themselves. This makes them not feel like they get a break [sic] or to can't switch off social media. . . . [A]bout 30% (and an even larger proportions of those who are unsatisfied with their lives) said that the amount of time they spend on social media makes them feel worse."

162. About half of teens want to take a break from **INSTAGRAM** or to get off the app. "[In another survey], we found that time spent is among one of the most negative experiences for **IG** (25%+ say they spend too much time on social media and it's worst on **INSTAGRAM** and Facebook). At the same time, they didn't think there was anything they could do about it and had fairly negative things to say about the time spent tools we have (particularly that the tools are easy to ignore)."

163. In January 2021, another **META** employee wrote: "No one wakes up thinking they want to maximize the number of times they open **INSTAGRAM** that day. But that's exactly what our product teams are trying to do."

164. **META** knew that its engagement-based ranking algorithm was structured in a way that mean that content which produces intense reactions (i.e., strong engagement, positive or negative) triggers amplification by the apps.

165. This propels users into the most reactive experiences, favoring posts that generate engagement because they are extreme in nature - and thus makes more advertising revenue for **META** and **INSTAGRAM**

166. **META** CEO Mark Zuckerberg publicly recognized this in a 2018 slideshow, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon **META**'s own ethical limits, with the following chart.



167. **META**'s researchers were clear in explaining that **INSTAGRAM** product features were responsible for these problems. In one chart illustrating the "High" amount of "Body, Appearance Comparison" on **INSTAGRAM**, researchers cited as contributing factors "Product mechanics (addicting)" and "Explore, discover, stalk (down the rabbit hole)."

168. In another slide, researchers noted the particular problems with **INSTAGRAM**'s Explore feature, as it contains "[t]ons of body image triggers".

169. **META** has an internal research team comprised of employees with expertise in computer science, psychology, and quantitative and qualitative analysis, among other things.

170. From 2019 to 2021, this team conducted a "teen mental health deep dive" which included focus groups, diary studies, and online surveys. One large-scale study paired a survey of tens of thousands of **INSTAGRAM** users with data about the time each respondent spent on **INSTAGRAM** and the type of content they viewed.

171. The evidence collected by **META**'s research team is damning. Among other findings, Defendants' researchers learned that:

    a. 41% of teen users of **INSTAGRAM** in the U.S. and U.K. who reported feeling "unattractive" said the feeling began while using the product.

    b. 32% of teenage girls said they felt bad about their bodies, and **INSTAGRAM** made them feel worse.

    c. **META**'s own internal documents were reviewed, and one stated "We make body issues worse for 1 in 3 teen girls"

    d.   Frequent social comparison is a key driver of subjective well-being and teens say **INSTAGRAM** makes the problem worse.

    e.   One in five teens say that **INSTAGRAM** makes them feel worse about themselves.

    f.   Two-thirds of teen girls on **INSTAGRAM** experience negative social comparison.

    g.   17% of teen girls **INSTAGRAM** users say the product makes eating issues worse (and these are only the teen girls who acknowledge they have an eating disorder).13.5% of teen girl **INSTAGRAM** users reported the product makes thoughts of "suicide and self-injury" worse.

    h.   About a quarter of teens who reported feeling "not good enough" said the problem started in **INSTAGRAM.**

    i.   Many teens said **INSTAGRAM** undermined their confidence in the strength of their friendships.

    j.   Teenagers who struggle with mental health say **INSTAGRAM** makes it worse.

    k.   Teens blame **INSTAGRAM** for increases in the rates of anxiety and depression among their age group in recent years - a response that was unprompted and consistent across all groups

    l.   Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to **INSTAGRAM.** We will never know the statistics of those who succeeded.

172. **META**'s internal researchers were not only clear about the fact that **INSTAGRAM** causes a high level of social comparison for teenagers; they were clear-eyed about the dire consequences.

173. They observed that the addictive nature of the **INSTAGRAM** product, combined with a tendency for users to share only the best moments and a pressure to match unrealistic beauty ideals can send teens into a downward spiral that includes anger, withdrawal, insecurity, and body dysmorphia— "a series of emotions that in many ways mimic stages of grief."

174. They further warned that "[u]sers experience of [this] downward spiral is exacerbated by our platform."

175. "Comparisons on **INSTAGRAM** can change how young people, especially teen girls, view and describe themselves," they noted, changing a girl's self-perception from "multi-dimensional" and "centered" to "not in control," "dark," boxed in," "low esteem," and "anxious."

176. The researchers' conclusions were stark: "Mental health outcomes related to this can be severe," and can include "eating disorders," "body dysmorphia," "body dissatisfaction," "depression," and "loneliness."

177. **META**'s own research demonstrates that social comparison is particularly bad on **INSTAGRAM** because, among other things, celebrity and influencer content is pervasive.

178. By manufacturing and emphasizing influence and celebrity, and purposely inundating tween and teen users with those accounts, **META** further exploits and monetizes social comparison.

179. That has come at a direct cost to the mental health of its teen users, including **MINOR DOE**, who are more susceptible to body dissatisfaction and negative social comparisons. Meta knows as much.

180. In 2021, its researchers found that exposure to content from "Top Accounts" (i.e., those with the top 0.1% of followers) was most associated with negative comparison and that **INSTAGRAM**'s influence-driven model ensures Top Accounts flood users' feeds almost half the time.

181. **META**'s internal research reveals that teen girls are eight times more likely to engage in negative social comparison than their male counterparts.



### *INSTAGRAM and META misrepresented its product and safety practices to MINOR DOE, MOTHER DOE, and the public.*

182. This addictive, predictable and studied assault on minors' self-esteem *makes them more vulnerable* to connection and flattery by strangers and trust the account when it is someone 'recommended' by **INSTAGRAM**.

183. This was particularly true for **MINOR DOE**, as she believed "Doug" was a teen boy complimenting her, and she felt safe engaging with the recommended account – by **INSTAGRAM**'s design, there was no way for her to know she was actually messaging with the 28-year-old assailant.

184. In **INSTAGRAM**'s Terms of Service, 4.1 it states:

"4.1 Who Can Use **INSTAGRAM**. We want our Service to be as open and inclusive as possible, but we also want it to be safe, secure, and in accordance with the law. So, we need you to commit to a few restrictions in order to be part of the **INSTAGRAM** community.

- **You must be at least 13 years old.**
- You must not be prohibited from receiving any aspect of our Service under applicable laws or engaging in payments related Services if you are on an applicable denied party listing.
- We must not have previously disabled your account for violation of law or any of our policies.
- **You must not be a convicted sex offender."**

185. **INSTAGRAM** has not deployed any process, feature, or safeguard to ensure sex offenders are not using its platform to target minors, such as **MINOR DOE**.

186. **INSTAGRAM** has not deployed any process, feature, or safeguard to ensure adults cannot present themselves as children to other real children, such as **MINOR DOE**.

187. **INSTAGRAM** has not deployed any process, feature, or safeguard to ensure content and profiles delivered to children are appropriate and safe. In other words, sexual predators use **INSTAGRAM** to target minors, AND **META** it is not only aware of this pervasive issue, but *actively avoids* implementing known solutions because it would decrease the number of users on the platform and reduce overall engagement on **INSTAGRAM** – thereby reducing **META**'s ability to collect data and serve ads.

188. **META** refuses to take any steps that would reduce the number of users on **INSTAGRAM**, even if they are fake accounts or engaging in illegal activities on the platform.

189. **META** has a clear financial incentive to have as many users as possible on **INSTAGRAM**, even pedophiles, so they can collect data and sell advertisements to the largest audience possible.

190. In fact, having multiple or fake accounts is so common, users invented the term "Finsta" (a combination of the words "fake" and "insta").

191. **META** knows that removing these fake accounts would reduce the total number of **INSTAGRAM** users *significantly* and would reduce overall engagement, as users would not be able to engage with the platform through multiple accounts or hide behind false identities.

192. **META** refuses to take any steps that would reduce engagement on the platform and acknowledges that problematic content gets the most engagement. **META** has a clear financial incentive to not only host, but to *push* this type of content to their young user base, including to **MINOR DOE**'s **INSTAGRAM** feed, in order to keep them coming back.

193. An internal study conducted in June of 2020 concluded that half a million **INSTAGRAM** users aged 13 to 17 receive "IIC" - which stands for "Inappropriate Interactions with Children" on a **daily** basis.[22]

194. **META** knows this, though they choose not to disclose this known, researched, and verified risk to parents or children. This omission deliberately misleads parents and children to think that sex offenders are not allowed on the platform, when they are in fact allowed and actively use the platform to target their victims. **META** is aware of this and allows it to continue unchecked on **INSTAGRAM**.

195. Yet at the same time as the June 2020 internal study, "Child Safety" was explicitly called out as a nongoal. A **META** executive explained to the team: "So if we do something here, cool.  But if we can do nothing at all, that's fine too."[23]

196. **INSTAGRAM**'s Privacy and Reporting Section states; "How **INSTAGRAM** Proactively Combats Impersonation: We use systems and tools that constantly monitor the **INSTAGRAM** ecosystem for potential imposters of public figures and creators."

---

[22] Notably, the language is dehumanizing and minimizes the problem.  It uses "account" instead of child and "IIC" instead of "Inappropriate Interactions with Children."

[23] https://www.dailymail.co.uk/sciencetech/article-11860547/Facebook-Instagram-used-aggressive-tactics-targeting-children-lawsuit-claims.html

197. This would lead a reasonable user, such as **MINOR DOE** and **MOTHER DOE**, to believe that **INSTAGRAM** was using systems and tools to detect and prevent imposter or fake accounts, such as the "Doug" account that was recommended to **MINOR DOE**.

198. **META** and **INSTAGRAM** knowing and intentionally spent a significant amount of money and resources convincing parents and their children that **INSTAGRAM** was safe for minors.

199. As an example, **INSTAGRAM** released an ad, **"Safety at Every Stage: INSTAGRAM Teen Accounts"** where the ad opens saying "teens are protected by default", showing a caring mom ensuring her kid brushes his teeth, wears a helmet, washes his hands, puts a band-aid on a scraped elbow, wears swim floaties, and look both ways before crossing the street.

200. The ad goes on to say, "You've always looked out for them. We're here to do it with you." **INSTAGRAM** Teen Accounts.







34



201. Another example of ads specifically targeting school-age children, suggesting **INSTAGRAM** is safe for minors is **Back to School** with teen influencer Gianina, who explicitly messages that Back to School is in partnership with **INSTAGRAM** and posted the promotion to **INSTAGRAM**'s YouTube channel.



202. In the video, Gianina shows off her "back to school" outfits and explains that **INSTAGRAM**'s new "Close Friends" feature allows her to share her outfits with a small group instead of a public post.

203. This feature was advertised to parents and children because it supposedly allows teens to share things with approved people instead of posting it to their account.

35

204. **META** has also advertised functions that allow parents to set time limits and supervise their child, however, these features require the parent to have an **INSTAGRAM** account of their own, and these protections can be easily deactivated at any time by either parent or child.

205. **META** knew the tools it had to combat addictiveness and use time were ineffective, yet **META** continued to tout these features to consumers, press, and stakeholders regarding their "work" to combat social media addiction, even knowing the data they were presenting was not only misleading, it was outright wrong.

    a.   "It's not just that Apple / Google have better data. Ours is wrong. Far worse. We're sharing bad metrics externally...the group that audits metrics we provide to the outside world, has called us out on it...The reason this is relevant is we vouch for these numbers. Any day they're out there is legal liability."

    b.   The deliberate absence of age verification measures allows predators to lie about their ages and masquerade as children, with obvious dangers to the actual children on **META**'s products, and **META** does not track or monitor the number of users using fake ages.

    c.   The deliberate absence of identification verification allows predators to create fake accounts on **INSTAGRAM** and hold multiple accounts presenting different identities. **META** does not track or monitor the number of accounts held by a single user.

206. **META**'s marketing strategy was to target teens as young as possible to create 'a pipeline' of future users. In 2018 it earmarked almost its *entire* global annual marketing budget ($390 million) to targeting teenagers.[24]

207. In 2024, **META** generated over $160 billion U.S. dollars in ad revenues. Advertising accounts for the vast majority of the social network's revenue, and the majority of ads are targeted to children and teens.

208. Far from acknowledging the serious defects in its products and warning children and parents of the same, **META** has launched advertising campaigns designed to encourage more children to use its products, such as **INSTAGRAM**—by touting the purported safety of those products.

---

[24] https://www.businessinsider.com/most-of-instagrams-global-ad-spend-targets-teens-report-2021-10

209. For example, in a recent television ad, **"Safe and Secure Connections"**, **META** claimed to parents that it "build[s] technology that gives you more control **and helps keep you safe**" including through its "industry leading AI" and other "tools that can protect— so you can connect."



210. **META** knows this is false. **INSTAGRAM** did not monitor, prevent or detect the fake profile of "Doug", an adult convicted sex offender pretending to be a teen boy who used **INSTAGRAM** to target **MINOR DOE.**

### ***INSTAGRAM and META knew that minors often use their platform, yet they have deliberately refused to enact meaningful protections for child and teen users.***

211. Not long after **META** bought **INSTAGRAM** in 2012, concerns were raised about inappropriate content spreading on **INSTAGRAM.**

212. **META** has a history of purchasing products that compete with their flagship product, Facebook, and then either shutting down their new acquisition or underfunding them in favor of improving **META**'s star platform. This was the case with **INSTAGRAM**, which by 2012 was Facebook's biggest competitor and threat.

213. **META,** as the parent company and founder of Facebook, "starved" its subsidiary of resources as compared to Facebook because the creator was concerned **INSTAGRAM** would eclipse their main product.

214. In a June 2019 report titled "Inappropriate Interactions with Children on **INSTAGRAM**", **INSTAGRAM**'s own researchers found that nearly 2 million accounts operated by minor

had been recommended to "groomers", meaning accounts that **INSTAGRAM** detected behaving inappropriately with children.[25]

215. 27% of all 'follow' recommendations to groomers were minors. **INSTAGRAM**'s researchers found that their algorithms were recommending nearly four times as many minors to groomers, and 22% of those recommendations resulted in a 'follow' request. *(ibid).*

216. In the same report, **META** said it compiled 3.7 million user reports of inappropriate comments over a three-month span - about one-third of which were reported by minors. In 54% of those cases, the minor was reporting an adult. *(ibid)*

217. According to a 2022 Pew Research Center report, 62% of U.S. teens report being active on the **INSTAGRAM** platform.[26]

218. With the majority of United States youth aged 13-17 using **INSTAGRAM**, there has been increased interest in the safety of this product.

219. In response to mounting pressure, on September 17, 2024, **INSTAGRAM** introduced "Teen Accounts", alleging that these accounts would automatically generate more protections for anyone between the ages of 13-17.[27]

220. These protections rely on the minor giving their actual age, which is never confirmed by **META** or **INSTAGRAM**.

221. Child advocacy groups ParentsTogether Action, the HEAT Initiative, and Design It for Us conducted a study of 13–15-year-old "young teen" users of **INSTAGRAM** Teen Accounts. This study found[28]:

    a.  58% of young teens encountered unsafe content or unsolicited messages;

    b.  50% of young teens believed that **INSTAGRAM**'s "Suggested for You" or "People You May Know" had accounts being run by adults, and half reported interacting with these accounts;

---

[25] https://www.straitstimes.com/world/united-states/instagram-suggested-groomers-connect-with-minors-ftc-says
[26] https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/
[27] https://about.fb.com/news/2024/09/instagram-teen-accounts/
[28] https://heatinitiative.org/wp-content/uploads/2025/09/Instagram-Teen-Accounts-are-Missing-the-Mark.pdf

    c. 52% of young teens received a follow or follow request from a person they didn't know and believed to be an adult, and 38% accepted that request; and

    d. 37% of young teen girls who received an unsolicited message from an adult said they believed the person was trying to begin a sexual relationship.

222. Arturo Bejar, **META**'s former senior leader responsible for product design and research for child safety from 2009-2015 and **INSTAGRAM** consultant from 2019-2021, spearheaded a report along with Cybersecurity for Democracy, FairPlay, the Molly Rose Foundation, ParentsSOS, and the HEAT Initiative. This report was designed to review **INSTAGRAM**'s Teen Account safety features and overall safety for teens.[29]

223. This report found that 64% of **INSTAGRAM**'s safety tools were either no longer available or had been made ineffective, and *only 17% of the safety features worked as advertised*.

224. "Recommendation-based features like Home, Reels, Discover, and Search should be fundamentally safe and age-appropriate by design. When **META** recommends content to a young person on these product features, typically through its personalized recommender algorithms, **the choices that inform these recommendations are a product design issue**." [Bejar report]

---

[29] https://mollyrosefoundation.org/wp-content/uploads/2025/09/Teen-Accounts-Broken-Promises-How-Instagram-is-failing-to-protect-minors.pdf



225. "Recommendation-based features like Home, Reels, Discover, and Search should be fundamentally safe and age-appropriate by design. When **META** recommends content to a young person on these product features, typically through its personalized recommender algorithms, **the choices that inform these recommendations are a product design issue**." [Bejar report]

226. "Our testing of Teen Accounts and **META**'s safety tools found a combination of tools that were no longer functional, tools that were buggy, and tools that by their own design would not prevent the harm they claimed to address. In several cases, we found that **META**'s own design circumvented its own safety tools. **These are all product design issues.**" [Bejar report]

227. "Adults can communicate with minors through many features that are inherent in **INSTAGRAM**'s design. In many of these cases, the adult strangers were recommended to the minor by **INSTAGRAM**'s features: Reels, People to Follow, etc."

40

## META'S BROKEN PROMISES

Meta implies that its safety tools and Teen Accounts make messaging between adult strangers and minors impossible and greatly reduces the likelihood of children being exposed to bullying and inappropriate comments. However, our results found that:

While Meta explicitly claimed that adults could not message users with Teen Accounts that did not follow them, it was in fact possible for an adult to message a teen who did not follow them when we first tested in March 2025.

The Hidden Words feature — which is supposed to hide or filter out common offensive words and phrases in order to prevent harassment — is largely ineffective, as are all similar features.

Multi-block, a tool to preemptively block new accounts that someone may create and a tool to prevent harassment, was not working when tested.

To this day, teens are actively encouraged by Instagram to follow adults they do not know. Once they do, those adults can message them.

Teens can message adults who do not follow them, and we did not encounter the promised safety notices encouraging teens to be cautious.

Teens are rewarded for selecting Disappearing Messages, making them vulnerable to predation and to accounts involved in illicit activities.

Teens remain unable to quickly or effectively report inappropriate or sexualized messages or comments they have received, including from adults.

228. When a minor experiences unwanted sexual advances or inappropriate contact, **META**'s own product design inexplicably does not include any effective way for the teen to let the company know of the unwanted advance.

229. The conscious absence of a tool that captures this information creates a state of "willful blindness" for **META** and means it is effectively impossible to manage or reduce this harm.

230. In another troubling design choice, **META** has implemented an animated reward or incentive for underage users to activate the feature "Disappearing Messages", and rewards their use with an animation. Disappearing Messages can be used for grooming, drug sales, etc., and leave the minor account with no recourse." [Bejar Report]

231. "We also found that some "follow" requests sent directly from adult strangers triggered a warning, yet no warnings were shown when **INSTAGRAM** algorithmically recommended adult strangers for a teen to follow. Teenagers remain unable to quickly or effectively report inappropriate or sexualized comments or messages they have received, including from adults."

232. "Our safety testing demonstrated not only that **INSTAGRAM**'s attempts at age assurance were evidently ineffective, but that the platform's engagement-based design was actively identifying and *promoting* content from children who claimed to be under the minimum joining age."

233. In June 2023, the Wall Street Journal reported that **INSTAGRAM** was connecting a vast network of pedophiles.[30] In the article, the search term "Gymnastics" led to accounts of young children and a network of predators and predatory comments.

234. In June 2025, **META** announced that it removed hundreds of thousands of accounts related to predatory behavior. In July, our testing found that while "Gymnastics" no longer led to finding accounts of young children, **INSTAGRAM**'s search autocomplete *recommended* searching for "Gymnastics girls young," which led to accounts of young girls similar to the ones reported in 2023.[31]

235. These girls' posts were met with predatory comments, such as, "The younger the soul the tighter the hole."[32]

236. "We also found evidence that suggested **INSTAGRAM**'s recommendation-based algorithm actively incentivized children under 13 to perform risky sexualized behaviors".[33]

237. The New Mexico Department of Justice conducted an undercover investigation of **INSTAGRAM** and discovered that users signing up as teens (using birth years showing the user was under 14) were pushed to a variety of sexualized content.[34]

238. On August 13, 2025, Attorney General Raul Torrez of New Mexico sent a letter to Adam Mosseri, Head of **INSTAGRAM**, expressing serious concerns about **INSTAGRAM**'s safety features.

---

[30] https://www.wsj.com/tech/instagram-vast-pedophile-network
[31] *ibid*
[32] *ibid*
[33] *ibid*
[34] https://nmdoj.gov/press-release/new-mexico-attorney-general-raul-torrez-announces-arrests-of-suspected-online-predators-following-operation-metaphile/

> ## Standing Up for New Mexico's Children
>
> STATE OF NEW MEXICO v. META PLATFORMS, INC, et. al.
> D-101-CV-2023-02838
>
> Our Office conducted an undercover investigation of Meta's platforms, creating
> decoy accounts of children 14 years and younger. The evidence revealed that
> those platforms are dangerous for New Mexico's children. For example, within
> three days of establishing one of the decoy profiles of a fictitious mother offering
> her 13 year old daughter to sex traffickers, and without any efforts to promote the
> account, the account reached its maximum limit of 5,000 Facebook friends and
> over 3,000 followers.

239. Attorneys General of thirty-five (35) other states signed the letter, including the Attorney General of Colorado.

240. "**INSTAGRAM** is once again prioritizing engagement over safety and has enabled a potentially dangerous feature without first ensuring the safety of their users, especially kids," said New Mexico Attorney General Raúl Torrez.

241. The letter underscores the responsibility of social media companies to protect their users, particularly those most vulnerable to exploitation.

242. Torrez reported to the Guardian he believes that what his own investigation has already uncovered is "just the tip of the iceberg when it comes to how **widespread and well known** this problem was inside the company".

243. Torrez says that he has been shocked by the findings of his team's investigations into online child sexual exploitation on **META**'s **INSTAGRAM** platform, which included having undercover officers pose as children on Facebook and **INSTAGRAM**.

244. "There was an **explosion of sexual interest from users attracted to the undercover accounts** that confirmed the scale and pervasiveness of what turned out to be this unregulated space, where unconnected adults had very quickly expressed the kind of sexual interest that we were concerned about," he says.

245. **INSTAGRAM**'s own reporting shows that over half of reported "Inappropriate Direct Messages" (DMs) were reported by a minor.

43



246. In May 2025, Accountable Tech and Design It For Us tested **INSTAGRAM** Teen Accounts and found that 100% of their test accounts were recommended sexual content, violating **META**'s own prohibitions around sensitive content for teen account holders.[35]

247. In June 2024, The Wall Street Journal described how, according to tests run by the newspaper and an academic researcher, "**INSTAGRAM** regularly recommends sexual videos to accounts for teenagers that appear interested in racy content, and does so **within minutes** of when they first log in."[36]

248. **INSTAGRAM** recommended the "Doug" profile for **MINOR DOE** and permitted "Doug" to groom and manipulate **MINOR DOE** through the platform with no warnings or safeguards for **MINOR DOE** or **MOTHER DOE**.

---

[35] https://accountabletech.org/statements/report-instagram-teen-accounts-recommend-body-shaming-hateful-and-sexual-content-to-young-users/

[36] https://www.wsj.com/tech/instagram-recommends-sexual-videos-to-accounts-for-13-year-olds

249. The assailant used this **INSTAGRAM** profile of "Doug" (below) (username FatMike710)
to present himself as a fellow teen, compliment **MINOR DOE,** gain her trust, and
ultimately offer a drug purchase through **INSTAGRAM** to lure her away from home for
her abduction and violent sexual assault through the assailant's fake **LYFT** rider account,
"Frank Frank".



## **THE ROLE OF LYFT**

***Lyft twice ignored its own policies against transporting an unaccompanied minor, ignored
the obviously fake account hailing the rides, ignored obvious red flag instructions to
pick up and drop her off out of site, and delivered a child along with her Hello Kitty
blanket to a convicted sex offender who drugged and sexually assaulted her.***

250. **LYFT** failed to prevent, detect, and disable an obviously fake **LYFT** account, and despite
actual knowledge of risks against minors, failed to train, supervise, or implement its own
policy to prohibit rides for unaccompanied minors.

251. **LYFT** failed to design a safe product, chose to put and keep an inherently dangerous
product on the market (pairing strangers without background checks or training with
minors), failed to disclose or warn about the lack of enforcement of their safety policies
around minors, failed to provide human capital to detect and prevent fake accounts and
failed to design a software system that could adequately detect and prevent fake accounts
from being used to order **LYFT** rides for unaccompanied minors.

45

252. By failing to train, supervise or enforce **LYFT**'s policies regarding minors, they delivered 13-year-old **MINOR DOE** to and from a convicted sex offender with an obviously fake **LYFT** account who proceeded to commit the following crimes against **MINOR DOE:**

    a.   Aggravated Sex Assault on a Child

    b.   Violent Crime - Sex Offense

    c.   Sex Assault - Under 15 - Force / Drug / Other

    d.   Strangulation

    e.   Second Degree Assault - Drugging of Victim

    f.   Drugging Victim

    g.   Enticement of a Child - Bodily Injury

### *Lyft owed a duty to MOTHER DOE and MINOR DOE.*

253. **LYFT** had a duty to train, supervise and implement its safety policies as to children.

254. **LYFT** had a duty to refuse the ride and to ensure all of its drivers know when they must refuse a ride.

255. **LYFT** had a duty to ensure drivers asked the age and verified the age of the passenger if they were unclear of the minor's age.

256. To the extent **LYFT** accepts custody of a minor in a **LYFT** vehicle, they have a duty to ensure that the minor, including **MINOR DOE**, is safe.

257. Two separate Lyft drivers transported unaccompanied **MINOR DOE** to and from a sex offender:

    a.   with an obviously fake Lyft account (e.g. "Frank Frank") even despite additional serious red flags of:

        i.   her young appearance;

        ii.   the time of day;

        iii.   her wearing pajamas outside;

        iv.   her only possession being her *Hello Kitty* blanket;

v.  suspicious instructions from the account holder "Frank Frank" to pick up
and drop off **MINOR DOE** out of view; and

vi.  **MINOR DOE** bleeding and being drugged on the ride back.

258. **LYFT**'s Safety Policies state "We don't allow passengers under the age of 18 to take a
ride on the LYFT platform without an adult… The driver *shall* also let a passenger know
that the driver will have to cancel the trip if the passenger is indeed under 18."



### Age requirement

Passengers must be at least 18 years old to sign up for a Lyft account, including Lyft
Family accounts.

We don't allow passengers under the age of 18 to take a ride on the Lyft platform
without an adult.

If a driver believes a passenger might be underage, the driver should ask the
passenger to confirm their age.

Riders who receive multiple reports for appearing to be underage will need to go
through an additional identity verification process. During the verification process,
the rider won't be able to take rides until a Lyft agent reviews their submitted
verification document.

The driver shall also let a passenger know that the driver will have to cancel the trip
if the passenger is indeed under 18.

In addition, drivers can report requests to transport unaccompanied minors by
tapping 'Contact Support' below.

259. **LYFT** owed a duty to **MOTHER DOE** and **MINOR DOE** not to aid in the kidnapping
of **MINOR DOE,** an obviously unaccompanied minor.

260. **LYFT** and its drivers had a duty to **MOTHER DOE** and **MINOR DOE** to follow *its own
policy* to refuse and cancel a ride request for an obviously unaccompanied minor.

261. **LYFT** had a duty to train its drivers on recognizing and responding appropriately to an
unaccompanied minor.

262. **LYFT** had a duty to truthfully disclose and warn to the public, including **MOTHER DOE**
and **MINOR DOE,** that despite a written policy against accepting rides for an

unaccompanied minor, the company does not train its drivers, supervise its drivers, or enforce this policy.

263. **LYFT**, as a Transportation Network Company (TNC), or rideshare company, had a duty to follow the laws and regulations of the State of Colorado and the Public Utilities Commission under C.R.S. §C.R.S. 40-10.1-605 - 40-10.1-609.

264. Colorado regulates TNCs because it is necessary for the health, safety, and welfare of the public and passengers.[37]

265. **LYFT** has a duty to design a product or deploy personnel that can prevent, detect and remove false accounts and profiles.

266. Picking up passengers, particularly minors, has clear public safety implications to protect the public and people like **MOTHER DOE** and **MINOR DOE**.

### *Lyft breached its duties to MOTHER DOE and MINOR DOE.*

267. **LYFT** failed its duty to protect Plaintiff, a minor child, from being drugged, kidnapped, and sexually assaulted through the **LYFT** platform.

268. **MOTHER DOE** is both a **LYFT** account holder as a passenger and a **LYFT** account holder as an authorized driver, although her accounts were not the accounts used for the rides provided by **Lyft Driver #1** and **Lyft Driver #2** when they transported **MINOR DOE.**

269. **LYFT** breached its duties to enforce its own policy against transporting or accepting rides for unaccompanied minors – *twice* and as a result **MINOR DOE** was delivered to a from a convicted sex offender.

270. The fact that two unrelated **LYFT** drivers failed to refuse the ride, report **MINOR DOE** or the "Frank Frank" account, and instead provided her a ride without question, demonstrates the ease and ubiquity with which **LYFT**'s policy is disregarded. **LYFT** is aware of this issue, but chooses not to enforce certain policies in order to provide as many rides as possible, even to minors.

271. **LYFT** breached its duties to **MOTHER DOE** to enforce its own policy against transporting or accepting rides for unaccompanied minors – *twice* and as a result **MINOR DOE** was delivered to a from a convicted sex offender.

---

[37] See legislative history SB 14-125.

272. **MINOR DOE** was transported by these **LYFT** drivers without **MOTHER DOE** knowing who took her daughter.

273. These **LYFT** drivers effectively helped abduct **MINOR DOE** using **LYFT**'s dangerous product.

274. Due to **LYFT**'s design choices and policy decisions, there was no oversight or verification that **LYFT** drivers only give rides to adults.

275. This is a deliberate choice by **LYFT** to ensure as many people as possible are able to use their product and earn revenue even if those people "should" be ineligible.

276. Not only did **LYFT** fail to train, supervise or enforce their weak policies pertaining to minors, they deliberately designed their product to *discourage* ride cancellations and financially penalize the drivers who did so, even if the driver canceled a ride for an unaccompanied minor.

277. **LYFT** has actual knowledge of underage riders using their product and services and is aware that rides are ordered on behalf of minors, including to traffic and assault children while maintaining anonymity.

278. **LYFT** has deliberately chosen to ignore the problem and **take no responsibility for its product design**, choosing instead to describe it as a "driver problem."

279. **LYFT** has actual knowledge of known problems with riders (and drivers) using fake accounts, and that those fake accounts are disproportionately tied to crimes against their drivers or passengers but has deliberately chosen to ignore the problem and **take no responsibility for its product design.**

### *LYFT's product and business model are inherently dangerous, especially for minors.*

280. **LYFT** owns and maintains its own uniquely designed business model, determines its own policies and procedures, chooses which policies to enforce, and owns the data generated through the **LYFT** app.

281. **LYFT** is in the business of pairing strangers together in a car through use of a software application, or "App", essentially hitch-hiking at scale for profit.

282. Unlike taxis, bus drivers or common carriers, **LYFT** chose to make their drivers 'independent contractors' rather than employees.

283. **LYFT's** business model to seeks to outsource all of their responsibilities to untrained and unsupervised 'independent contractors' makes them inherently more dangerous than other

49

professional driving companies.

284. This business model is inherently dangerous because **LYFT** seeks to remove itself entirely from any role to investigate, screen, train or supervise their drivers, despite heavily advertising the safety of their product.

285. **LYFT's** policies are illusory and misleading because while they sound good and encourage the public to reasonably rely on them, **LYFT's** actual business model has no enforcement mechanisms for any of its policies as it relates to passenger or driver safety.

286. They do not disclose this fact to the public, **MOTHER DOE** or **MINOR DOE**.

287. **LYFT** does not conduct background checks on drivers or riders.

288. **LYFT** does not confirm the accuracy or identity of driver or customer profiles or accounts and has a known problem of false accounts, including the obviously false account of convicted sex offender "Frank Frank", used to lure, drug, kidnap and sexually assault **MINOR DOE**.

289. **LYFT's** business model makes it is easy to create fake accounts and there is no verification process. This allows **LYFT** to provide their product to the largest audience possible, including sex offenders and minor children.

290. Cracking down on fake accounts and verifying users who sign up would deter bad actors from using **LYFT**. Despite the harm they could avoid, **LYFT** deliberately chooses to allow these bad actors to continue using their product in order to continue profiting from them.

### *LYFT misrepresented its product and its business practices.*

291. **LYFT** misrepresented their commitment to public safety in its marketing and on its public website, when they knew they did not enforce their policies to prevent **LYFT** drivers from picking up and transporting unaccompanied minors or prevent, detect or block fake accounts - a clear and known safety problem.

292. For example, they ran a video ad promising **Safety in Every Ride.**



293. For example, **LYFT** also publicly presents a safety policy that they know is misleading.





294. **LYFT** misrepresented that they would refuse to accept rides for unaccompanied minors.



## Age requirement

Passengers must be at least 18 years old to sign up for a Lyft account, including Lyft Family accounts.

We don't allow passengers under the age of 18 to take a ride on the Lyft platform without an adult.

If a driver believes a passenger might be underage, the driver should ask the passenger to confirm their age.

Riders who receive multiple reports for appearing to be underage will need to go through an additional identity verification process. During the verification process, the rider won't be able to take rides until a Lyft agent reviews their submitted verification document.

The driver shall also let a passenger know that the driver will have to cancel the trip if the passenger is indeed under 18.

In addition, drivers can report requests to transport unaccompanied minors by tapping 'Contact Support' below.

a. **LYFT**'s Terms of Service state "You understand that providing Rideshare Services to unaccompanied persons under the age of 18 is prohibited, and **you *will* cancel any ride involving an unaccompanied person under the age of 18**."

b. **LYFT**'s Safety Policies state "We don't allow passengers under the age of 18 to take a ride on the LYFT platform without an adult… **The driver *shall* also let a passenger know that the driver will have to cancel the trip if the passenger is indeed under 18**."

295. Despite the clear language of the policy, *two* **LYFT** drivers failed to follow this policy when they transported **MINOR DOE** to and from a sexual offender.

296. **LYFT** misrepresented that they verify profile accuracy of accountholders. **LYFT** announced by public press release on August 27, 2024 that they would begin verifying the identity of user accounts.[38]

297. Plaintiff was trafficked to her abuser's location using **LYFT**'s app, **LYFT**'s platform, **LYFT**'s brand, **LYFT**'s payment portal, with a **LYFT**-sanctioned profile for "Frank Frank" as a rider.

298. On November 14, 2024, **Lyft Driver #1** and **Lyft Driver #2** had access to a rider profile clearly depicting an adult make that did not visually or name match the actual thirteen (13) year old girl passenger they were picking up and dropping off from their cars.

299. The **LYFT** rider profile "Frank Frank" was fake and actually belonged to a convicted sex offender by a different name.

### ***Defendant LYFT had actual knowledge that minors often use their platform, yet they have deliberately refused to enforce their underage rider policy.***

300. **LYFT** had knowledge of the problem because they received prior complaints from customers.

301. **LYFT** had knowledge of the problem because they have received letters from several elected officials expressing their concerns around the prevalence of sex assaults facilitated through the **LYFT** app, particularly those involving minor children.

302. **LYFT** had knowledge of the problem because they have repeatedly been contacted by law enforcement for reports involving sex offenders using the **LYFT** platform to deliver

---

[38] https://www.lyft.com/safety/rider-verification ; See for example: https://finance.yahoo.com/news/lyft-follows-uber-footsteps-rider-161659372.html

their victims.

303. An investigation by NBC Chicago found that **LYFT**'s rules regarding unaccompanied minors are "routinely ignored". An NBC producer reported that she "found no shortage of teen riders, who reacted with shock when they were informed they were too young to ride."[39]

304. When NBC Chicago sent three girls downtown to hail rides, nearly every Uber and **LYFT** driver they encountered welcomed them aboard, even after they informed those drivers they were only 12 and 13 years old.

305. Bryant Greening of LegalRideshare, a Chicago law firm, stated to NBC Chicago: "I think it's obvious that Uber and **LYFT** are going to try to make money where they can...[w]hat we see is that a lot of drivers and a lot of users are not reading those terms"

306. "Data from within the last 90 days for Current, a debit card company that caters to teens, shows that Uber and **LYFT** account for *94 percent* of all taxi service transactions for customers aged 13 to 18. Combined, these companies are the second-most popular merchant behind Apple when it comes to teen spending."[40]

307. A 2019 C.S. Mott Children's Hospital National Poll on Children's Health found that one in eight parents reported that their 14–17-year-old child had used **LYFT** or Uber.[41]

308. In 2019, WRTV Indianapolis reported on a 16-year-old who snuck out using a rideshare service unbeknownst to her parents. **LYFT** responded for the article, saying **it's up to the driver to determine if that person is underage**. **LYFT** reiterated that if drivers believe their passenger is underage the drivers are supposed to contact customer service so they can investigate.[42]

### _Defendant LYFT had actual knowledge that sexual offenders use their platform to abduct and traffic minor children, yet they have deliberately refused to enforce their underage rider policy._

309. On June 6, 2023, Senators Richard Blumenthal, Josh Hawley, Marsha Blackburn, and Jon Ossoff sent a letter to **LYFT** CEO David Risher[43] regarding the prevalence of human

---

[39] https://www.nbcchicago.com/news/local/nbc-5-uber-lyft-underage-passengers-investigation/2036252/
[40] https://www.vox.com/the-goods/2019/9/9/20853328/underage-teens-uber-lyft
[41] https://ihpi.umich.edu/news-events/news/mott-poll-report-april-2019-are-ride-sharing-services-safe-teens
[42] https://www.wrtv.com/news/working-for-you/underage-riders-taking-advantage-of-uber-and-lyft
[43] https://www.blumenthal.senate.gov/imo/media/doc/06122023lyfttraffickingletter.pdf

trafficking and child abduction on the platform and demanding answers about how **LYFT** was going to address these serious problems.

310. On October 25, 2022, the Federal Bureau of Investigation released Alert Number I-102522-PSA, "Criminal Actors Leverage Rideshare Vehicles to Abduct Minors".



311. On November 13, 2023, **LYFT** and a hotel chain reached a $9 million settlement after an 11-year-old was trafficked through the **LYFT** platform. The plaintiff in that case alleged that although **LYFT** had a policy against transporting underage minors, **LYFT** failed to provide adequate training or enforce the policy.

312. A Polaris report regarding human trafficking in the transportation industry noted that while personal vehicles and taxis were more common in the past, rideshare services rapidly replaced other means of transportation. "In fact, all survivor participants in sex trafficking focus groups who now work as service providers for current victims and survivors all attested that their clients frequently (if not exclusively) use services such as Uber and **LYFT** when traveling to out-call appointments."[44]

---

[44] https://polarisproject.org/human-trafficking-and-the-transportation-industry/

313. In response to mounting pressure, **LYFT** partnered with the Department of Homeland Security for their "Blue Campaign".

314. Despite promises in the media, the training materials provided by the Blue Campaign are not mandatory, nor do they replace actual enforcement of **LYFT**'s policies.

315. "Michael DiPasquale, a lawyer for a Kansas teenager who said she was transported via **LYFT** when she was 13 years old, said **LYFT** and its driver should have picked up on numerous flags in her case to stop potential abuse. He also said **LYFT** had failed for years to put in place measures that might deter child sex exploitation, such as verifying riders' ages. "The more safeguards they put in place, the harder it is for them to gain users," said DiPasquale, "The status quo is good for their bottom line, but it's not good for users."[45]

### _LYFT says it is up to the drivers to refuse unaccompanied minors, but they do not screen, vet or train the drivers on any of the safety measures that would detect and prevent unlawful use of their platform._

316. **LYFT**'s business model requires maximizing warm bodies as drivers and they explicitly marketed to prospective drivers how easy it is to sign up, and how little monitoring or supervision would follow.

317. Drivers for **LYFT** have shared online that they are _penalized_ for canceling rides when the passenger is underage, creating an actual _disincentive_ to enforce or follow their policy.



318. **LYFT** drivers can face penalties such as losing bonuses, and can get suspended for canceling too many rides, even if they are canceling because the rider confirmed they were under 18.

---

[45] https://www.nbcnews.com/tech/tech-news/uber-lyft-lawsuit-abuse-rape-sexual-assault-children-rcna149529



319. By counting cancelations for underage riders against the driver's profile, **LYFT** has deliberately created a system that punishes drivers for following the rules in order to attract as many users as possible, even if they are underage.



320. **LYFT** consistently put profit, public relations, company growth, and marketing interests over that of transparency and public safety of their passengers and the public.



***LYFT's conduct, product, actions and omissions, and misrepresentations
proximately caused injuries to MINOR DOE and MOTHER DOE.***

321. Had **LYFT** followed, implemented, trained or enforced its policies against transporting unaccompanied minors, **MINOR DOE** never would have been abducted and delivered to a sexual predator.

322. Had **LYFT** prohibited, detected or blocked the fake rider profile of "Frank Frank", in accordance with their own verification policies, **MINOR DOE** never would have been abducted and delivered to a sexual predator.

323. Had **LYFT** designed a product with basic safety in mind, **MINOR DOE** never would have been abducted and delivered to a sexual predator.

324. Had **LYFT** truthfully disclosed or warned the public that they do not enforce their stated policies, and that they had a *known problem* with fake accounts, minors, trafficking and pedophiles, it is unlikely **MINOR DOE** would have accepted a ride to see "Doug".

325. Had **LYFT** not created disincentives to cancel rides for minors, it is more likely a driver would have refused the ride, and **MINOR DOE** never would have been abducted and delivered to a sexual predator.

326. **LYFT** breached its duties, put an unreasonably dangerous product on the market, misrepresented its product and safety protocols, failed to warn about known risks and dangers, and proximately caused injuries to **MINOR DOE** and **MOTHER DOE.**

## CLAIMS FOR RELIEF

***Section 230 of the Communications Decency Act does not provide immunity to any of the
Defendants.***

327. **LYFT**'s liability under this action is for its own conduct, its own speech, and for its choices in designing its own product and protocols for creating and not following or enforcing its own policies, and for their role in knowingly facilitating trafficking, drugging, and sexual assault on a children, such as **MINOR DOE,** and the foreseeable impact on parents like **MOTHER DOE**.

328. **META's** liability under this action is for its own conduct, its own speech, and for its choices in designing its own product and protocols for creating and not following its own policies or invest in reasonable, market-available and far safer design choices, and for their role in the facilitation of trafficking, drugging and sexual assault on a children, such as **MINOR DOE,** and the foreseeable impact on parents like **MOTHER DOE**.

329. **INSTAGRAM**'s liability under this action is for its own conduct, its own speech, and for its choices in designing its own product and protocols for creating and not following its own policies or invest in reasonable, market-available and far safer design choices, and for their role in the facilitation of trafficking, drugging and sexual assault on a children, such as **MINOR DOE**.

## **FIRST CLAIM FOR RELIEF**
### **(Negligence)**
*Plaintiffs **MOTHER DOE,** on behalf of **MINOR DOE** and in her individual capacity, against Defendants **META PLATFORMS, INC.** and **INSTAGRAM, LLC***

330. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

331. **META** and **INSTAGRAM** were negligent and did not exercise reasonable care toward **MINOR DOE** or **MOTHER DOE**.

332. **META** and **INSTAGRAM** have a duty of care to its customers and the public to follow the law, live up to its promises, and take reasonable measures to prevent their platform from being used to groom and traffic minor children. This duty arises from:

    a. **Common Law.** The duty arises as a function of common law to simply exercise reasonable care to its customers and the public.

    b. **Agency & Control.** The duty also arises from the near-total control **META** and **INSTAGRAM** have over the design, presence or lack of safety features, choices over who is matched with whom, what the algorithms reward, and where it chooses to prioritize its time and resources.

    c. **Addicting Children.** The Choice to Addict Children for profit comes with heightened responsibilities. **META** and **INSTAGRAM** made and invested millions in their decisions to recruit, hook, and addict children to its platform without corresponding safety features.

    d. **META** and **INSTAGRAM** have total control over who can have an **INSTAGRAM** profile and who is blocked from the platform.

    e. **META** and **INSTAGRAM** have total control over red-flag works and conduct that should warrant removal and reporting on its platform.

    f. **META** and **INSTAGRAM** have total control over whether adults can proposition

children and choose whether or not they want to engage age verification, a practice that is feasible and in use by other companies around products such as tobacco, alcohol, gaming, and streaming services.

g. **Verification technologists exist now in the market and existed at the time of the incident.** Providers exist in the marketplace who provide these services such as Jumio, ID.me, Veriff, Onfido, IDScan.net, or AU10TIX and modalities to verify could include ID scanning, facial recognition, AI analysis, or data checks to confirm user age and identity for compliance.

h. **META** and **INSTAGRAM**, alone, decides who can access its app, what policies and procedures it will adopt and implement, and what, if any, safety measures it designs and enforces.

i. **META** and **INSTAGRAM** decide who and what is recommended to whom on their platform.

333. **The Business Model.** The duty arises from the inherent design and implementation of a business model that prioritizes profit over safety. By their own design, **INSTAGRAM**'s business model:

a. **advertises aggressively** to young customers;

b. **monetizes and rewards** clicks and engagements for advertising revenue;

c. **allows minors** to easily create accounts;

d. **does not verify the age** of the user;

e. **allows fake names and profiles;**

f. **allows sex offenders**, groomers and drug dealers to access their platform to engage minors;

g. **does not remove** problematic accounts (fake profiles or adult strangers contacting minors) because it would interfere with their profit model based on user engagement.

334. **Foreseeability.** The duty arises from the foreseeability of the harm. Despite numerous warnings from law enforcement, regulatory agencies, elected officials, and advocacy groups, **META** and **INSTAGRAM** have deliberately failed to actually enforce their policy against sex offenders creating accounts, or sexual or drug propositioning to minors.

335. **META** and **INSTAGRAM** breached its duty to Plaintiff.

336. **META** and **INSTAGRAM** breached its duty by **failing to enforce its own policies,** such

60

as those prohibiting sex offenders from creating accounts to contact minors. Those breaches and failures include, but are not limited to:

    a. Failure to establish and enforce reasonable policies and procedures to prevent sex offenders, traffickers, and drug dealers from propositioning minor children;

    b. Choosing to design a product that rewards minors for choosing "Disappearing Messages" to reduce the incriminating data that can be collected;

    c. Failure to verify that the person creating an account is real and is who they say they are;

    d. Failure to heed or follow the advice and warnings of their own staff, researchers and whistleblowers about the harm **META** and **INSTAGRAM** were causing.

    e. Failure to implement the software and design changes that internal staff proposed to help address the known problem of fake profiles, creating or exacerbating mental health problems in children, and adults using the platform to groom and hurt children.

    f. Failure to enforce their own policies and guidelines, including policies against allowing **INSTAGRAM** accounts for users under the age of 13;

337. Specifically, **META** and **INSTAGRAM** failed to implement or enforce their own policies around account verification by allowing the assailant to create an **INSTAGRAM** account with a false name and a false age.

338. **META** and **INSTAGRAM** failed to utilize industry best practices and standards to stop the use their app by sexual predators for sex trafficking and meaningfully reduce the occurrence of sexual exploitation on its teen users.

339. As a direct and proximate result of **META** and **INSTAGRAM**'s negligence, **MOTHER DOE** and **MINOR DOE** sustained injuries, damages, and losses as set forth herein.

340. But for the **INSTAGRAM** app, **MINOR DOE** would not have been introduced to or connected with the convicted sex offender who abducted, drugged and sexually assaulted her on November 14, 2024.

341. **META** and **INSTAGRAM** were negligent and failed to exercise reasonable care in detecting and preventing fake accounts and in serving, recommending, and allowing groomers, traffickers and adults to prey on children every day, including **MINOR DOE**.

342. The assailant that **INSTAGRAM** recommended to **MINOR DOE,** "Doug", caused serious bodily injury and significant psychological injuries that will forever change her life and impact her future earning capacity.

343. **MOTHER DOE**'s life has also changed forever, incurring additional costs, including moving their home, counseling, physical therapy, and lost wages from missed work.

344. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

345. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

## SECOND CLAIM FOR RELIEF
### (Negligent Misrepresentation)
*Plaintiffs MOTHER DOE on behalf of MINOR DOE and in her individual capacity against Defendants META PLATFORMS, INC. and INSTAGRAM, LLC*

346. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

347. **META** and **INSTAGRAM** negligently gave false information to the public, **MINOR DOE** and **MOTHER DOE**, including, but not limited to;

    a.   That sex offenders are not allowed on **INSTAGRAM** - *false***;**

    b.   That teens are safe on **INSTAGRAM** - *false***;**

    c.   That users are who they say they are and **INSTAGRAM** prohibits false accounts - *false*;

    d.   That sexually suggestive, or illegal propositioning of minors is prohibited - *false.*

348. **MINOR DOE** and **MOTHER DOE** reasonably *relied* upon such information; and

349. This reliance was a cause of physical harm to **MINOR DOE** and **MOTHER DOE.**

350. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

351. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

## THIRD CLAIM FOR RELIEF
### (Common Law Strict Liability Misrepresentation Product Restatement (Second) Torts §402B)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendants **META PLATFORMS, INC. and INSTAGRAM, LLC***

352. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

353. **META** and **INSTAGRAM** created and sold the app, software, interface, and advertising revenue model ("**the INSTAGRAM model**");

354. **META** and **INSTAGRAM** were engaged in the business of marketing the **"INSTAGRAM model"** to the public, **MINOR DOE** and to the assailant**;**

355. **META** and **INSTAGRAM** misrepresented facts concerning the character or quality of the **INSTAGRAM** that would be material to potential purchasers or users of the product, including but not limited to:

   a. *deceptively* stating sex offenders are not allowed to use their platform, when they are - and was in the harm against **MINOR DOE**;

   b. *deceptively* stating that they do not allow fake accounts, when they do - and there was a fake account in the harm against **MINOR DOE**;

   c. *deceptively* stating that they verify the identity or age of their users, when they don't - and was in the harm against **MINOR DOE**, who believed she was messaging with a fellow teen;

   d. *deceptively* stating **INSTAGRAM** is safe for teens, when it is not - and clearly was not safe in the harms against **MINOR DOE**;

   e. *deceiving* **INSTAGRAM** advertisers with artificially high clicks, impressions and engagement pricing that knowingly included fake accounts, illegal accounts, and clicks and engagements *used in the commission of crimes against minors*.

356. These misrepresentations were made to potential purchasers or users**,** including **MINOR DOE** and **MOTHER DOE** as members of the public at large;

357. As a user and potential user, **MINOR DOE** and **MOTHER DOE** reasonably *relied* on the misrepresentation;

358. **MINOR DOE** was a person who would reasonably be expected to **use or be affected by the "INSTAGRAM model"** as young teens are **INSTAGRAM**'s target audience**;**

359. **MOTHER DOE** was a person who would reasonably be expected to be affected by the **"INSTAGRAM model"** as a parent whose child is targeted, kidnapped, drugged, assaulted, monetized, and injured through **INSTAGRAM**.

360. **MINOR DOE** and **MOTHER DOE** had injuries, damages, and losses caused by the reasonable reliance on the misrepresentations.

361. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

362. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

## FOURTH CLAIM FOR RELIEF
### (Common Law Strict Liability Defective Product - Unreasonably Dangerous Product Restatement (Second) Torts 402A)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendants **META PLATFORMS, INC.** and **INSTAGRAM, LLC***

363. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

364. **META** and **INSTAGRAM** were the manufacturer of the **INSTAGRAM** platform, app, software, interface, design, business practices around its product;

365. **META** and **INSTAGRAM** were engaged in the business of selling[46] and marketing the **INSTAGRAM** platform and app not just in terms of providing accounts targeted to minors, but is also (and arguably *primarily*) in the business of selling valuable advertising based on a designed model of addiction, clicks, engagement, targeting, and impressions.

---

[46] Selling for purposes of **INSTAGRAM's** model in this complaint means soliciting customers to create user profiles 'for free' then monetizing it in conjunction with selling advertising to third parties based on their data and the number of 'engagements'.

366. **META** is highly profitable, with 2024 revenue of over $164 billion and a net income of about $62.4 billion.

367. **INSTAGRAM** is a massive revenue driver for **META** contributing roughly 29-30% of **META**'s total revenue in recent years (2022-2023)**,** with projections suggesting it could hit over 50% of U.S. ad revenue by 2025. [47]

368. **META** and **INSTAGRAM** designed its platform and the advertising model tied to it for use and consumption by the public and offered its product, services, and data globally, in the State of Colorado, and to **MINOR DOE** and **MOTHER DOE**.

369. The product was defective because:

    a. Their product was designed to be addictive, and thereby profitable, for the company;

    b. Their product has known mental health consequences, including depression, suicide, eating disorders, anxiety, loss of confidence and self-esteem;

    c. The more time a minor spends on the platform, the more likely they will be injured in the form of either worsened mental health or contact illicit sexual images and propositions for sex or drugs.

    d. The platform is infested with fake accounts and adult sexual predators and drug dealers targeting teens on their platform who may be trying to groom or entice youth to meet them in person;

    e. They do not prohibit, monitor, or remove sex offenders from their platform;

    f. They left these fake and predatory accounts active, and the design defect unresolved, because the *metrics* from their engagement boosted their advertising revenue.

370. Because of these defects, **INSTAGRAM**'s app, software, interface and advertising revenue model ("**the INSTAGRAM model**") was *unreasonably dangerous* to **MINOR DOE** and other teens who might reasonably be expected to use, or be affected by the **INSTAGRAM** app.

371. The **"INSTAGRAM model"** and product was defective at the time it was sold to **MINOR DOE** by **META** and **INSTRAGRAM** and when it left its control and their product was delivered to her, a vulnerable 13-year-old.

---

[47] https://www.bloomberg.com/news/articles/2024-12-18/instagram-expected-to-generate-50-of-meta-s-us-ad-sales-in-2025

372. The **"INSTAGRAM model"** was expected to reach the user or consumer without substantial change in the condition in which it was sold.

373. The **"INSTAGRAM model"** did reach **MINOR DOE** without substantial change in the condition in which it was sold.

374. **MINOR DOE** was a person who would reasonably be expected to use, consume or be affected by the **"INSTAGRAM Model"**.

375. As a direct result of **INSTAGRAM**'s defective produce, **MINOR DOE** and **MOTHER DOE** suffered injuries and losses.

376. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

377. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

### FIFTH CLAIM FOR RELIEF
### (Common Law Strict Liability, Product Liability, Failure to Warn,
### Restatement (Second) Torts §402A)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendants **META PLATFORMS, INC. and INSTAGRAM, LLC***

378. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

379. While **INSTAGRAM** *is* an inherently dangerous product for its intended use (monetizing minors for a worldwide stream of commerce), the product most certainly becomes unreasonably dangerous without adequate warnings for both parents and teens alike.

380. To be adequate, the warnings must inform the ordinary user of any specific risk of harm that may be involved in any intended or reasonably expected use.

381. **INSTAGRAM** and **META** did not adequately warn the parents or children, **MOTHER DOE** or **MINOR DOE** that:

   a. Their product was designed to be addictive, and thereby profitable, for the company;

   b. Their product has known mental health consequences, including depression, suicide, eating disorders, anxiety, loss of confidence and self-esteem;

    c. The more time a minor spends on the platform, the more likely they will be injured in the form of either worsened mental health or contact illicit sexual images and propositions for sex or drugs.

    d. The platform is infested with fake accounts and adult sexual predators and drug dealers targeting teens on their platform who may be trying to groom or entice you to meet them in person;

    e. They do not prohibit, enforce or remove sex offenders from their platform.

382. These risks of harm are *not* apparent to an ordinary teen user or their parents from the product itself, in part because these are *hidden risks* but known to **INSTAGRAM** and **META,** but also because **META** and **INSTAGRAM** make safety assurances to the contrary.

383. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

384. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

### SIXTH CLAIM FOR RELIEF
**(Colorado Consumer Protection Act C.R.S. §§ 6-1-105**
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity
against Defendants **META PLATFORMS, INC.** and **INSTAGRAM, LLC***

385. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

386. **META** and **INSTAGRAM** engaged in a deceptive trade practice, including but not limited to:

    a. **Misrepresentation and false claims**, including but not limited to:

        i. *deceptively* stating sex offenders are not allowed to use their platform, when they are - and was in the harm against **MINOR DOE**;

        ii. *deceptively* stating that they do not allow fake accounts, when they do - and there was a fake account in the harm against **MINOR DOE**;

  iii. *deceptively* stating that they verify the identity or age of their users, when they don't - and was in the harm against **MINOR DOE**, who believed she was messaging a fellow teen.

  iv. *deceptively* stating **INSTAGRAM** is safe for teens, when it is not - and clearly was not safe in the harms against **MINOR DOE**.

b. **Failure to disclose material facts** to the public, their users, including **MOTHER DOE** and **MINOR DOE** including but not limited to**:**

  i. use of their product is designed to be, and is in fact, addictive;

  ii. adults can and do pose as children through fake accounts and profiles;

  iii. frequent use of the product increases risk of depression, anxiety, eating disorders, loss of confidence, and suicidal ideation;

  iv. sexual predators and drug dealers use this platform to target young vulnerable users.

c. **Catchall - Engaging in any other unfair, unconscionable, deliberately misleading, false, or fraudulent act or practice.** *See* C.R.S. § 6-1-105(1)(rrr)

  i. Specifically, **INSTAGRAM** deliberately created *an incentive* for young people to choose *disappearing* messages, which knowingly compounds an existing and significant safety problem for minors.

  ii. **META** and **INSTAGRAM** did this through their "Vanish Mode" using, emojis, reward points, and other known forms of positive re-enforcement on the platform.

  iii. The specific reward mechanism is a visual one: when a user activates Vanish Mode in a chat by swiping up, the screen changes to a dark theme, and an animation (often described as falling emojis, like shushing emojis) appears.

  iv. This use of animation acts as a positive reinforcement or "reward" in the app's design, which researchers and child safety advocates argue is a deliberate choice to encourage minors to use the feature.

  v. Vanish Mode is popular because it offers a sense of "private, temporary conversations" without leaving a permanent record, mimicking in-person

conversations and providing a feeling of spontaneity and an extra layer of privacy.

vi. Disappearing messages in minor accounts is a known safety problem.[48]

vii. Disappearing messages make it less possible for parents to oversee their teen's accounts.

viii. Disappearing messages make it less possible for law enforcement to detect and charge for crimes committed against children, and

ix. Disappearing messages make it less likely that **META** and **INSTAGRAM** would have the full extent of data to demonstrate the extent of their already-known problem.

x. Further, the assailant was able to delete his account, with his side of the conversations, to destroy evidence needed by law enforcement.

387. These deceptive trade practices occurred in the course of the **META** and **INSTAGRAM**'s goods and services.

388. The deceptive trade practice *significantly impacts the public* as actual or potential consumers of the defendant's business, in some of the following ways:

a. According to a 2022 Pew Research Center report, 62% of U.S. teens report being active on the **INSTAGRAM** platform.[49]

b. Child advocacy groups ParentsTogether Action, the HEAT Initiative, and Design It for Us conducted a study of 13–15-year-old users of **INSTAGRAM** Teen Accounts. This study found[50]:

   i. 58% of young teens encountered unsafe content or unsolicited messages;

   ii. 50% of young teens believed that **INSTAGRAM**'s "Suggested for You" or "People You May Know" had accounts being run by adults, and half reported interacting with these accounts;

---

[48] https://ny1.com/nyc/all-boroughs/ap-top-news/2025/09/25/instagrams-deliberate-design-choices-make-it-unsafe-for-teens-despite-meta-promises-report-finds
[49] https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/
[50] https://heatinitiative.org/wp-content/uploads/2025/09/Instagram-Teen-Accounts-are-Missing-the-Mark.pdf

      iii.  52% of young teens received a follow or follow request from a person they didn't know and believed to be an adult, and 38% accepted that request; and

      iv.  37% of young teen girls who received an unsolicited message from an adult said they believed the person was trying to begin a sexual relationship.

  c.  These deceptive practices significantly impact *more than half of teens* in the State of Colorado *and* their parents, Colorado's mental health systems, education systems, and how this entire generation will grow into adulthood.

389. **MINOR DOE** was an actual or potential customer of **META** and **INSTAGRAM** and was injured in the course of its business as a result of the deceptive trade practice.

390. **The deceptive trade practice caused actual damages or losses to Plaintiffs.**

391. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

392. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.


## SEVENTH CLAIM FOR RELIEF
### (Extreme and Outrageous Conduct)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendants **META PLATFORMS, INC.** and **INSTAGRAM, LLC***

393. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

394. **META** and **INSTAGRAM** engaged in extreme and outrageous conduct, in the following ways, including, but not limited to:

  a.  Deliberately, intentionally and knowingly *targeting minors* to be their main users and revenue for their **INSTAGRAM** platform and spending hundreds of millions of dollars to deliberately target and grow an underage customer base;

  b.  Deliberately, intentionally, and knowingly *allowing convicted sex offenders*, drug dealers, groomers and sex traffickers to use their platform, designed to attract youth;

c.  Deliberately, intentionally, and knowingly creating *an addictive product* that harms mental health of children, making them even more susceptible and vulnerable to adult predators;

d.  The product and design *is known to be addictive* because it leverages brain chemistry, particularly dopamine release from likes and new content, combined with design features like infinite scroll, autoplay, and personalized algorithms, creating habit loops that trigger "Fear Of Missing Out" (FOMO), compulsion, and social validation, making users crave constant engagement to avoid negative feelings and seek pleasure.[51]

e.  **INSTAGRAM** knows that its product creates and worsens *mental health problems* in young people and harms young girls, in particular, by fueling body dissatisfaction, eating disorders, depression, and low self-esteem through curated, unrealistic beauty standards, social comparison, cyberbullying, and addictive design, often leading to poor sleep and even self-harm ideation, with algorithms pushing harmful content further, according to internal research and health advisories.

f.  Deliberately, intentionally, and knowingly continuing all of the features that make vulnerable children, *even more vulnerable* to the outreach, grooming and harms caused by **INSTAGRAM** pairing or recommending pedophiles to children.

g.  Even after having clear knowledge and data about the significance of this problem, the *CEO declined to act* on available measures available to make the platform safer, and instead chose profits over safety, because the removal of child predators propositioning their teen users would impact the number of follows and engagements, that are the basis of their advertising revenue model.

h.  Deliberately, intentionally, and knowingly choosing to continue to misrepresent and market the 'safety' of its products giving parents and children a false sense of security in using their product, when they knew better.

i.  Deliberately, intentionally, and knowingly failed to *warn* parents and children about the known risks to using their product.

---

[51] https://med.stanford.edu/news/insights/2021/10/addictive-potential-of-social-media-explained

395. **META** and **INSTAGRAM** did so recklessly, intentionally after full knowledge of the facts, data, research and problems causing the **MOTHER DOE** and **MINOR DOE** severe emotional distress;

396. **META** and **INSTAGRAM**'s conduct (knowingly pairing children with sex offenders) is so extreme and outrageous in character, and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community.

397. **META** and **INSTAGRAM**'s conduct *caused* **MINOR DOE** and **MOTHER DOE** severe emotional distress.

398. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

399. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

### EIGHTH CLAIM FOR RELIEF
#### (Negligent Infliction of Emotional Distress)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendants **META PLATFORMS, INC.** and **INSTAGRAM, LLC***

400. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

401. **META** and **INSTAGRAM**'s conduct were negligent in that they failed to exercise reasonable care and that negligence created an unreasonable risk of harm to **MINOR DOE** and **MOTHER DOE**.

402. **META** and **INSTAGRAM**'s negligence created an unreasonable risk of physical harm to the plaintiff;

403. Specifically, the risk of recommending an adult sex offender, leading to abduction, drugging, sexual assault and death threats to a 13-year-old-girl is an *unreasonable* risk of harm.

404. The was a known risk to **META** and **INSTAGRAM.**

405. **META** and **INSTAGRAM**'s negligence caused **MINOR DOE** to fear for her safety and

life as she was abducted, locked in with a sexual predator, drugged, strangled, sexually assaulted for eighteen (18) hours, went into seizures, and was told in no uncertain terms that assailant would kill her and her family if she ever told anyone. The assailant now knew where **MINOR DOE** and **MOTHER DOE** lived because Plaintiffs' address was now in his **LYFT** account.

406. **META** and **INSTAGRAM**'s negligence caused **MOTHER DOE** not only to fear for her daughter's safety but for her own safety as well because she was aware of the assailant's credible threat to kill **MINOR DOE** and **MOTHER DOE** if **MINOR DOE** ever went to the authorities (which they did).

407. As of today, **PLAINTIFFS** *still* live in continued fear for their safety.

408. While the assailant has been apprehended and charged, he has managed significant delays in the proceedings, has not yet been arraigned, tried or sentenced and there is credible concern that he could use his network in the present tense to still make good on his threats to kill **MINOR DOE, MOTHER DOE** and the rest of their family.

409. **PLAINTIFFS'** fear caused injuries and losses.

410. Because of **META** and **INSTAGRAM**'s negligence, the exposure to sustained and intense fear meant that:

    a. **MOTHER DOE, MINOR DOE** and their whole family had to move fairly abruptly and rent a different home, because of real, ongoing and credible threat of death and retribution to their family for reporting the incident.

    b. **MINOR DOE** was pulled out of school in the immediate aftermath of the incident and ultimately changed schools and has struggled to maintain her grades and focus on her education.

    c. **MINOR DOE** has panic attacks, nightmares, PTSD, depression with suicidal ideation, anxiety, guilt, shame, social withdrawal, loss of trust, and a lost sense of personal safety.

    d. **MOTHER DOE** has PTSD, anxiety, guilt, and insomnia. She gets tearful and physically ill every time she has to deal with this -- which is daily.

411. **META** and **INSTAGRAM** *knew* it had a systemic problem with minors using the platform and adults using the platform to entice, traffic, groom or abduct children.

412. **META** and **INSTAGRAM** also knew it had a problem with people using false names to hide their identity.

413. **META** and **INSTAGRAM** 's reckless and negligent conduct includes, but is not limited to:

a.  failure to prevent or detect fake accounts targeting and grooming minors, in this case "Doug";

b.  failure to implement age verification for users of its platform;

c.  knowingly designing and pushing addictive content and algorithmic modeling to children without deploying commensurate safety protocols;

d.  recommending and connecting **MINOR DOE** follow and engage with a convicted sex offender, "Doug" on their platform.

e.  failure to prevent and take reasonable remedial measures after learning that sexual predators were using **META** and **INSTAGRAM**'s platform to traffic, drug and / or minor victims;

f.  failing to heed, fund and implement recommendations from internal employees that would have made **META** and **INSTAGRAM** safer, and prevented this incident from occurring.

414. Plaintiffs were in the zone of danger created by **META** and **INSTAGRAM**'s actions and inactions.

415. **MINOR DOE** never would have met "Doug", the assailant but for the introduction and recommendation by **META** and **INSTAGRAM**, and the abduction, drugging, strangulation and assault never would have occurred.

416. As a direct and proximate result of **META** and **INSTAGRAM**'s actions and inactions, Plaintiffs suffered injuries, damages, and losses, as set forth herein, including but not limited to:

a.  **MINOR DOE:** Physical injuries, medical treatment, medical expenses, counseling, additional academic support, future earning capacity, future ability to have children, pain, suffering, anguish, anxiety, guilt, shame, nightmares, suicidal ideations, loss of enjoyment of life and impacted relationships.

b.  **MOTHER DOE:** Expenses to move their residential home on an emergency basis, medical expenses for treatment for her daughter, counseling costs for both **MOTHER DOE** and **MINOR DOE**, wage loss, reduced earning capacity, loss of enjoyment of life.

417. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **META** and **INSTAGRAM** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13-17-201(2).

74

418. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

## NINTH CLAIM FOR RELIEF
### (Negligence)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendant **LYFT, INC.***

419. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

420. **LYFT** was negligent and did not exercise reasonable care toward **MINOR DOE** or **MOTHER DOE**.

421. **LYFT has a duty of care to its passengers** to follow the law and take reasonable measures to prevent their platform from being used to traffic minor children. This duty arises from:

   a. **Common Law, Statutes & Regulations.** The duty arises as a function of common law, statutory law, and regulatory law for transporting passengers.

   b. **Agency & Control.** The duty also arises from the near-total control **LYFT** has over the process both from the user's side and the driver's side.

   c. **LYFT** has total control over recruiting, training, and onboarding of its drivers; the driver and passenger interface of the **LYFT** app; and the front and back end of the website that directs the experience.

   d. **LYFT**, alone, decides who can access its app, what policies and procedures it will adopt and implement, whether it will comply with local laws, and what, if any, safety measures it designs and enforces.

   e. **LYFT** has full control over the driver experience, the passenger experience, including policies, enforcement, technical functioning, and communications between users and drivers.

422. **The Business Model.** The duty arises from the inherent design and implementation of a business model that prioritizes profit over safety. By their own design, **LYFT**'s business model:

    a. punishes drivers for all cancelations, even if the rider explicitly says they are underage;

    b. does not punish drivers for accepting fares from minors;

    c. allows minors to easily create accounts and order rides;

    d. does not verify the age of the rider at any point, and instead relies on their "independent contractor" drivers to ask if they suspect someone is underage;

    e. allows account holders to create profiles with fake names;

    f. allows account holders to easily order rides for unrelated children and transport them without parental consent;

    g. allows the account holder to give instructions for drivers picking up another person, such as picking them up out of view of their home;

    h. does not monitor rides to ensure passenger safety.

423. **Foreseeability.** The duty arises from the foreseeability of the harm. Despite numerous warnings from law enforcement, regulatory agencies, elected officials, and advocacy groups, **LYFT** has deliberately failed to actually enforce their policy against unaccompanied minors in favor of retaining the revenue from these rides.

424. **LYFT** breached its duty to Plaintiffs.

425. **LYFT breached its duty by failing to enforce its own policies,** such as those prohibiting drivers from transporting minors. Those breaches and failures include, but are not limited to:

    a. Failure to establish and enforce reasonable policies and procedures to prevent drivers from giving rides to minor children;

    b. Failure to establish and enforce reasonable policies and procedures to prevent sex traffickers from using the app;

    c. Failure to train and supervise drivers;

    d. Failure to verify that the person getting into the car is the same person who ordered the ride through a profile authorized by the company;

e.  Failure to monitor or use technology, including video and / or audio recording to ensure a safe ride (even basic customer service calls are generally "recorded for quality control purposes" - and there is far less risk to public safety in that example);

f.  Failure to explicitly require drivers to acknowledge that they know and understand that they cannot transport an unaccompanied minor;

426. To the extent it appears at all, a requirement not to provide rides to unaccompanied minors in the current driver agreement includes in small print as ¶10(j);

427. Failure to explicitly require drivers to acknowledge the rules or policies against transporting unaccompanied minors or a person who does not match the rider profile.

428. **LYFT** breached its duty of care by failing to ensure the **LYFT** drivers who picked up Plaintiff would refuse to transport an unaccompanied minor who did not match the rider profile.

429. **LYFT** failed to implement or enforce their own policies around account verification by allowing the assailant to create a **LYFT** account with a false name.

430. **LYFT** failed to utilize industry best practices and standards to stop the use their app for sex trafficking and meaningfully reduce the occurrence of sexual exploitation on its passengers.

431. As a direct and proximate result of Defendant **LYFT**'s negligence, Plaintiffs sustained injuries, damages, and losses as set forth herein.

432. But for the **LYFT** app, **MINOR DOE** would not have been transported to the sexual predator's house and sexually assaulted on November 14, 2024.

433. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts.  If, however, the court decides otherwise, Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13-17-201(2).

434. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

## TENTH CLAIM FOR RELIEF

### (Negligent Supervision)

*Plaintiffs MOTHER DOE on behalf of MINOR DOE and in her individual capacity against Defendant LYFT, INC.*

435. Plaintiff incorporates and re-alleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

436. **LYFT exercised a significant amount of control over its drivers**, despite their efforts to characterize their drivers as 'independent contractors, including but not limited to:

    a.  Whether a driver can create a **LYFT** profile;

    b.  Whether a driver can login and access the **LYFT** platform, app or software;

    c.  Whether a driver can 'see' a potential ride;

    d.  Whether a driver can 'accept' a potential ride;

    e.  How much that can be charged for the ride;

    f.  Who the driver must (nondiscrimination) and may not (minors) accept for a ride;

    g.  Who is allowed to use and display the **LYFT** logo;

    h.  Who is allowed to appear in a rider's account as an authorized **LYFT** driver;

    i.  What kind of vehicle a driver may use;

    j.  What kind of repairs or maintenance is required on a vehicle;

    k.  When and how a driver will be paid and for how much money; and

    l.  What kind of crimes or history of unsafe driving disqualifies a driver from **LYFT.**

437. **Colorado law recognizes employer liability, even over 'independent contractors'** in certain circumstances where activities are *inherently dangerous*, where the *employer is negligent* in supervising the independent contractor, and when there is a *nondelegable duty* to ensure safety.

438. **Transporting unaccompanied minors is *inherently dangerous*.** An activity is considered *inherently dangerous* if it presents a special or peculiar danger to others that is inherent in the nature of the activity or the particular circumstances under which it is performed, and this danger is different from ordinary risks commonly encountered.

439. **LYFT**, carrying on an inherently dangerous activity, such as transporting unaccompanied minors, must exercise the highest possible degree of skill, care, caution, diligence, and

foresight with regard to that activity, according to the best technical, mechanical, and scientific knowledge and methods which are practical and available at the time of the claimed conduct which caused the injury.  The failure to do so is negligence. CJI 9:7.

440. **LYFT** knew that transporting unaccompanied minors was *inherently dangerous* which is why **LYFT** created a written policy to prohibit **LYFT** rides for unaccompanied minors.

441. **MINOR DOE** was picked up by **Lyft Driver #1** in the middle of the night by herself, in her pajamas, with her *Hello Kitty* blanket, hailed from an obviously fake **LYFT** account ("Frank Frank"), and dropped off by herself in the middle of the night with irregular instructions.

442. **MINOR DOE** was picked up by **Lyft Driver #2** bleeding, drugged, dazed, traumatized and with her *hello kitty* blanket, hailed from an obviously fake **LYFT** account ("Frank Frank").

443. Two out of two **LYFT** drivers accepted a minor passenger in their vehicle and custody, without question, suggesting that these drivers were either unaware of **LYFT**'s policy, did not believe it would be enforced if they violated it, or feared a penalty if they canceled.

444. **LYFT** failed to train or supervise its drivers and further had policies that actually penalized drivers who complied with their policy by cancelling rides for unaccompanied minors.

445. This horrific incident is exactly *why* it is inherently dangerous to be transporting unaccompanied minors because children can be abducted, trafficked, injured, groomed, assaulted, stranded because they are inherently more vulnerable.

446. **LYFT was negligent in supervising its drivers and enforcing its written policies** against accepting rides for unaccompanied minors.

447. An employer can also be responsible for their independent contractors in Colorado when the employer is negligent in supervising the independent contractor.

448. **LYFT** had no mechanism in place to enforce their own policy and zero supervision over their drivers to ensure compliance with it.

449. The harms that occurred to **MINOR DOE** were foreseeable, and **LYFT's** negligence in training or supervising their drivers on these policies proximately caused the injuries to **MINOR DOE** and **MOTHER DOE**.

450. **By accepting an accompanied minor into LYFT**'s custody and control, they had a *nondelegable* duty deliver the minor safely and **LYFT** cannot delegate this duty to an untrained, unsupervised and unvetted, independent contractor.

451. **LYFT** had a duty to monitor, enforce, and supervise to ensure that the drivers did not transport unaccompanied minor children, or someone who did not match the rider profile.

452. **LYFT** breached its duty to supervise and oversee that its drivers met the requirements outlined by LYFT itself, including following the policy against transporting unaccompanied minors.

453. This duty is nondelegable.

454. **LYFT** acted unreasonably and below a reasonable standard of care in failing to implement fraud detection on their accounts, despite industry standards, allowed assailant to use a false name for his **LYFT** account, and allowed a system where it was typical for a rider not to match the profile.

455. **LYFT**'s failure to conduct ongoing monitoring of their drivers was unreasonable considering the known risks, the industry standards, and the availability of practical options to do so.

456. As a direct and proximate result of Defendant **LYFT**'s negligent supervision and oversight, Plaintiff sustained injuries, damages, and losses as set forth herein.

457. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13-17-201(2).

458. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

## ELEVENTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Causing Physical and Psychological Harm)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendant **LYFT, INC.***

459. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

460. **LYFT** negligently (failing to exercise reasonable care) gave false information **to MINOR DOE** and **MOTHER DOE.**

461. **LYFT** represented to **MOTHER DOE** and the public that they *will not* accept rides for unaccompanied minors.

80

462. This representation is *false* because unknown to **MOTHER DOE** and **MINOR DOE** it is a policy without any oversight or enforcement mechanism from **LYFT**.

463. **MOTHER DOE** was given this information as an authorized **LYFT** driver herself and also by virtue of the terms of service with her **LYFT** rider account.

464. **MOTHER DOE** and **MINOR DOE** *relied* on these representations by **LYFT**.

465. **MOTHER DOE** had every assurance from **LYFT** that unless she was in the vehicle with her daughter and hailed the ride, **MINOR DOE** would not be transported to an adult stranger, by a **LYFT** driver without **MOTHER DOE**'s knowledge, consent or presence.

466. **MOTHER DOE** and **MINOR DOE** reasonably *relied* upon such information.

467. **The reliance was a cause of physical and psychological harm to MINOR DOE,** including but not limited to:

   a. Aggravated Sex Assault on a Child

   b. Violent Crime - Sex Offense

   c. Sex Assault - Under 15 - Force / Drug / Other

   d. Strangulation

   e. Second Degree Assault - Drugging of Victim

   f. Drugging Victim

   g. Enticement of a Child - Bodily Injury

   h. Physical, economic and psychological injuries to **MINOR DOE**

468. **The reliance was a cause of physical and psychological harm to MOTHER DOE,** including but not limited to Economic and psychological injuries.

469. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts. Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

470. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

## TWELFTH CLAIM FOR RELIEF

### (Common Law Strict Liability Misrepresentation Product,

### Restatement (Second) Torts §402B

*Plaintiffs MOTHER DOE on behalf of MINOR DOE and in her individual capacity against Defendant LYFT, INC.*

471. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

472. **LYFT** was a manufacturer of the **LYFT** app, software, platform, and business model and sold the product.

473. **LYFT** was engaged in the business of selling such product for use or consumption.

474. **LYFT** misrepresented facts concerning the character or quality of the product and service that was material to potential purchasers or users of the product, including but not limited to:

   a.  That **LYFT** would not transport unaccompanied minors[52]; and

   b.  That **LYFT** would not allow riders to use fake profiles[53].

475. **LYFT**'s misrepresentations were made to potential purchases or users as members of the public at large on their website, in their terms of service, in their safety policies, in the driver's app, and in the rider's app.

476. **MOTHER DOE** as a purchaser and user and **MINOR DOE** as a third party reasonably *relied* on the representations.

477. **MOTHER DOE** was a person who would reasonably be expected to use or be affected by **LYFT's** product and **MINOR DOE** was someone **LYFT** identified and acknowledged as in appropriate for use of its services and *falsely* represented that would not happen**.**

478. **MINOR DOE** is a third party in the class of persons intended to be protected by **LYFT**.

479. **MINOR DOE** and **MOTHER DOE** had injuries, losses, and damages caused by the reasonable reliance of **MOTHER DOE** and **MINOR DOE** on the representations.

---

[52] Lyft Safety policies:  https://help.lyft.com/hc/en-us/all/articles/115012923127-Safety-policies#age
[53] Lyft Terms of Service, 9(a), 9(o), 9(u)

480. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts.  Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

481. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

<u>**THIRTEENTH CLAIM FOR RELIEF**</u>

**Common Law Strict Liability Defective Product - Unreasonably Dangerous Product Restatement (Second) Torts 402A)**

*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendant **LYFT, INC.***

482. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

483. Defendant **LYFT** "offers a ride-sharing service, but it provides its own *proprietary product* – the **LYFT** application – that its drivers and passengers are required to use in order to provide or receive the service that **LYFT** is selling."

484. **LYFT** manufactures, designs, sells, markets, advertises, labels, and makes available in the stream of commerce the **LYFT** App, which is a self-contained computer program or software package that runs inside of an operating system.

485. **LYFT** is engaged in the business of selling rides through use of its **LYFT** app, pairing riders and drivers.

486. **LYFT**'s app and the business model surrounding it was defective because they failed to detect and prevent false accounts and failed to prevent unaccompanied minors from getting transported by **LYFT**.

487. These defects are *inherently* and *unreasonably* dangerous to passengers, particularly minors who might reasonably expect rider (and driver) profiles to be real and that the product and business model would have designed a way to keep children from being transported to and from groomers and traffickers using **LYFT**'s product.

488. **LYFT**'s product reached Plaintiffs without substantial change or modification in the condition it was sold.

489. Every interaction between a driver and passenger is controlled by **LYFT**, including its features, buttons, method of payment, matching algorithms.

490. The **LYFT** App does not consist of user-controlled content.

491. The features and functionality of the **LYFT** App, including, but not limited to all aspects

of the user interface, were designed, developed, implemented, coded, and controlled by
**LYFT**.

492. **LYFT** is in complete control of which passengers and drivers may use the app.

493. **LYFT** made decisions and controlled all text and graphics that appear when users
accessed the **LYFT** App or **LYFT** website, by developing, updating, or modifying its
technology infrastructure on the backend.

494. **LYFT** made decisions about what statements, representations, or warnings, if any, would
appear in natural language on the front end of the **LYFT** App that consumers, including
Plaintiffs, would interact with.

495. **LYFT**'s product is unreasonably dangerous, to minors in particular, because one does not
ordinarily expect that children will be hailed and picked up by strangers with fake profiles
and no ability or effort to stop this use of the product.

496. Sadly, Plaintiffs experience is sadly not unique, and **LYFT** has known about and failed to
make reasonable design changes to their product.

497. The risk of harm from failing to prevent fake accounts, to children in particular, is not
outweighed by the benefits of convenience or profits to **LYFT.**

498. Other companies have figured out how to verify identity in software accounts and design,
and **LYFT** could, if it wanted to, do the same.

499. As the designer of a product, **LYFT** had the duty to conduct a hazard analysis (e.g.,
technology facilitated hitchhiking between strangers for profit) to identify risks associated
with its product and then mitigate those risks in accordance with industry standards for
severity and frequency, among other things.

500. As the designer of a product, **LYFT** had a duty to control for risks in accordance with the
hierarchy by (1) designing away the risks; (2) guard against any risks that cannot be
designed out; and (3) to warn against any risks that could not be designed away or guarded
against.

501. **LYFT** did not conduct an adequate hazard analysis.

502. It was reasonably foreseeable to **LYFT**, as the designer of the **LYFT** App, that minor
children were at risk of kidnapping or other sexual misconduct facilitated by the **LYFT**
app, particularly through the use of fake profiles.

503. **LYFT** failed to design away the ability to easily create fake profiles and failed to
reasonably design away foreseeable risks of kidnapping or other sexual misconduct
facilitated through the **LYFT** app.

504. **LYFT** failed to mitigate against known risks, placing profit over passenger and public

safety.

505. **LYFT** failed to guard against the foreseeable risks of kidnapping or other sexual misconduct by, among other things:

    a. Failing to enforce their policy against underage riders;

    b. Punishing drivers who did report underage riders;

    c. failing to monitor or provide video or audio recordings of the ride;

    d. failing to prevent, detect, or stop users from creating false **LYFT** profiles and using the **LYFT** app to order rides for minors while hiding their identity; and

    e. failing to design their app and technology to deploy inward facing cameras in the vehicle (like FedEx, UPS, Amazon and Sysco do) to monitor passenger safety and reduce known safety risks.

506. The **LYFT** product at the time of Plaintiff's kidnapping and assault was defective and in unreasonably dangerous condition to the public, including Plaintiff.

507. The **LYFT** product is expected to and does reach the consumer in this defective condition in the manner designed and sold by **LYFT**.

508. The design defects include, but are not limited to, a design that does not comport with the legal and regulatory requirements for passenger qualifications in the State of Colorado.

509. The design defects include, but are not limited to:

    a. a design that fails to detect and block imposter rider accounts using **LYFT**'s branded software but instead allows them to order rides for minor children.

    b. a design that fails to utilize readily available systems and technologies to confirm the age and identity of their passengers;

    c. a design that encourages drivers not to report underage riders;

    d. a design that is easily and often utilized by sex traffickers to transport victims due to the lack of driver training and supervision;

510. The design defect(s) caused **MINOR DOE**'s and **MOTHER DOE**'s injuries and losses.

511. Defendant **LYFT** sold the product and is in the business of selling products.

512. **MINOR DOE** and **MOTHER DOE** sustained damages as a result.

513. Plaintiff reserves the right to amend her complaint as new information becomes available through the discovery process.

514. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts.  If, however, the court decides otherwise, Plaintiffs, in good faith, believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13-17-201(2).

515. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

### FOURTEENTH CLAIM FOR RELIEF
### (Common Law Strict Liability, Product Liability, Failure to Warn, Restatement (Second) Torts §402A)
*Plaintiffs MOTHER DOE on behalf of MINOR DOE and in her individual capacity against Defendant LYFT, INC.*

516. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

517. **LYFT** sold the app software and access to its driving services to the public, to the assailant, that enabled **MINOR DOE** to be transported to a sex offender.

518. **LYFT** was engaged in the business of selling the **LYFT** software and app platform for ridesharing for sale and use by the public.

519.  **LYFT** knew that it had a serious and structural safety issue as it pertains to transporting unaccompanied minors to drug dealers, kidnappers and pedophiles.

520. **LYFT** knew it had a serious and structural safety issue with the inability to prevent, detect and shut down fake account profiles for riders (or drivers).



**Lyft Drivers**
Chris Mo · November 17 at 6:00 AM · 🌐

I'm sure this has come up before but since Lyft likes to ask about my "feeling of safety" everytime I go offline, I figured I'd bring it up.  Why is it okay for passengers to use fake names or an alias,  or fake photos or no photo at all when Lyft claims to be all about our well being and safety?  Over just the last few nights I've driven, I've gotten ride requests from "Big" "Unknown" or just a single letter of the alphabet such as "K".  None had a profile photo.  I actually asked the guy who went to "Unknown" if it was an error in the app and he just laughed and said no it wasn't and still never told me his name even after bringing it up.  Are passengers vetted at all? I'm guessing not.

👍 42                                                                          76 comments

521. **LYFT** misrepresented its policy as to its product that they will not transport unaccompanied minors – except clearly, they do:

### Age requirement

Passengers must be at least 18 years old to sign up for a Lyft account, including Lyft Family accounts.

We don't allow passengers under the age of 18 to take a ride on the Lyft platform without an adult.

522. **LYFT** states in its Terms of Service that it is prohibited to request Rideshare Services for an unaccompanied person under 18 years old. *See* TOS ¶9(u).[54]

523. **LYFT** misrepresented in its public and account policies that it prohibits fake accounts by riders in their Terms of Service, Section 9. Restricted activities:

   a. Impersonate any person or entity. *See* TOS ¶9(a);

   b. Use a false email or other identifying information, impersonate or misrepresent any person or entity, or your affiliation with any person or entity, or otherwise omit, mispresent or mislead as to the origin or source of an entity accessing the **LYFT** platform. *See* TOS, ¶9(o).

524. **LYFT**'s misrepresentations would are material to potential and actual users and purchasers because it clearly implicates the safety of using their product and whether parents can know **LYFT** will enforce their policies to protect minors.

525. **LYFT**'s misrepresentations were made to potential purchasers or users as members of the public at large on their website, in their app, and in public statements.

526. As a user (rider), **MINOR DOE** was dependent on and relied upon **LYFT** to enforce its own policies and had they done what they represented they would do, she never would have been abducted, drugged and sexually assaulted.

527. As a user (rider), and occasional (driver)**,** and as **MINOR DOE**'s mother, **MOTHER DOE** was aware of and relied on **LYFT**'s representations and was dependent upon **LYFT** to enforce its own policies and had they done what they represented they would do, her daughter never would have been abducted, drugged and sexually assaulted.

---

[54] https://www.lyft.com/terms

528. **MOTHER DOE** and **MINOR DOE** reasonably relied on the misrepresentations.

529. **MOTHER DOE** and **MINOR DOE** were each persons who would reasonably be expected to use or be affected by **LYFT**'s statements as to fake accounts and minor access to rides with strangers.

530. **MINOR DOE** has injuries, damages, and losses caused by the reasonable reliance on **LYFT**'s misrepresentations.

531. **MOTHER DOE** has injuries, damages, and losses caused by the reasonable reliance on **LYFT**'s misrepresentations.

532. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts. If, however, the court decides otherwise, Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13- 17-201(2).

533. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

**FIFTEENTH CLAIM FOR RELIEF**
**(Colorado Consumer Protection Act C.R.S. §§ 6-1-105(1)(u))**
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity*
*against Defendant **LYFT, INC.***

534. Plaintiffs incorporate and re-allege, by reference, all other paragraphs in this Complaint as if fully set forth herein.

535. **LYFT engaged in a deceptive trade practice**, including but not limited to:

    a.  allowing fake profiles for **LYFT** riders or drivers which allows people to present as someone they are not to deceive drivers or users and commit and facilitate crimes through use of the **LYFT** app.

    b.  deceiving **LYFT** account holders and the public that they have a policy against transporting unaccompanied minors, when they have no process to actually enforce this policy.

    c.  **LYFT** has marketed itself as a safe option for passengers and the public without accurate or truthful disclosures about the extent of their known problems for their services being used as a courier to abduct, traffic, and assault minor children.

      d. **LYFT** publicly states that they are committed to safety, yet in litigation, they routinely indicate that they have no responsibility at all for anyone's safety and seek to outsource all responsibility to their untrained, unvetted, and unsupervised drivers.

536. **The deceptive trade practice occurred in the course of the defendant's goods and services.** All of the above deceptive trade practices occur *repeatedly* in the course of **LYFT**'s ride share app and services.

537. **The deceptive trade practice significantly impacted the public as actual or potential consumers of the defendant's business,** in the following ways:

      a. 21% of Colorado's 4.4 million adults, or 924,000 people have a **LYFT** ride share account in Colorado[55];

      b. The use of ride shares to abduct children is a common enough problem with sufficient public impact that the FBI issued a public warning that criminals are using ride shares to abduct children.[56]

      c. 1 in 8 teens report using ride share, despite explicit policies prohibiting it.

      d. Parents are concerned about the public impact of minors on rideshare as reflected in a national poll on children's health.[57]



---

[55] https://civicscience.com/infographic
[56] https://www.fox4news.com/news/fbi-warns-of-criminals-using-rideshares-to-abduct-children
[57] https://mottpoll.org/reports/are-ride-sharing-services-safe-teens

538. These practices misrepresented the known reality to **LYFT** and *deceptively* caused Plaintiffs to believe that only genuine accounts could hail a **LYFT** and that **LYFT** would not transport an unaccompanied minor.

539. **The plaintiff was an actual or potential customer of LYFT or was injured in the course of its business as a result of the deceptive trade practice**, in the following ways:

    a. **MINOR DOE** was an actual or potential user of **LYFT**'s ride share services who was injured by the allowance of a fake account to hail her ride belonging to a convicted sex offender and who was injured by their failure to follow their own policy indicating they will not provide rides to unaccompanied minors. **MINOR DOE** could have died.

    b. **MOTHER DOE** is an authorized driver and rider account holder with **LYFT** but did not authorize or hail the ride that caused the incident. Because of **LYFT's** deceptive trade practices she had a false assurance that her daughter could not be transported without her presence.

540. **The deceptive trade practices caused actual damages** or losses to **MINOR DOE**, including but not limited to physical injuries, permanent medical impairment, psychological and non-economic damages, future lost earning capacity, and may never be able to have her own children in the future because of the injuries she sustained.

541. **The deceptive trade practices caused actual damages** or losses to **MOTHER DOE**, including but not limited to the cost of having to move their home, provide counseling for her daughter and herself, seek medical care for her daughter, lost time from work, prioritizing care and healing for her daughter.

542. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts. Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13-17-201(2).

543. Plaintiffs reserve the right to amend her complaint as new information becomes available through the discovery process.

### SIXTEENTH CLAIM FOR RELIEF
### (Negligent Infliction of Emotional Distress)
*Plaintiffs **MOTHER DOE** on behalf of **MINOR DOE** and in her individual capacity against Defendant **LYFT, INC.***

544. Plaintiffs incorporate and re-alleges, by reference, all other paragraphs in this Complaint

as if fully set forth herein.

545. **LYFT**'s conduct was negligent in that they failed to exercise reasonable care and that negligence created an unreasonable risk of harm to **MINOR DOE** and **MOTHER DOE**.

546. Specifically, the risk of abduction, drugging, sexual assault and death threats to a 13 year-old-girl is an *unreasonable* risk of harm.

547. **LYFT**'s negligence caused **MINOR DOE** to fear for her safety and life as she was abducted, locked in with a sexual predator, drugged, strangled, sexually assaulted for eighteen (18) hours, went into seizures, and was told in no uncertain terms that assailant would kill her and her family if she ever told anyone. He now knew where **MINOR DOE** and **MOTHER DOE** lived because Plaintiffs' address was now in his **LYFT** account.

548. **LYFT**'s negligence caused **MOTHER DOE** not only to fear for her daughter's safety but for her own safety as well because she was aware of the assailant's credible threat to kill **MINOR DOE** and **MOTHER DOE** if **MINOR DOE** ever went to the authorities (which they did).

549. As of today, **MOTHER DOE** and **MINOR DOE** *still* live in continued fear for their safety.

550. While the assailant has been apprehended and charged, he has managed significant delays in the proceedings, has not yet been arraigned, tried or sentenced and there is credible concern that he could use his network in the present tense to still make good on his threats to kill **MINOR DOE, MOTHER DOE,** and the rest of their family.

551. Plaintiffs' ongoing fear caused injuries and losses.

552. Because of **LYFT**'s negligence, the exposure to sustained and intense fear meant that:

    a. **MOTHER DOE, MINOR DOE,** and their whole family had to move fairly abruptly and rent a different home, because of real, ongoing and credible threat of death and retribution to their family for reporting the incident.

    b. **MINOR DOE** was pulled out of school in the immediate aftermath of the incident and ultimately changed schools and has struggled to maintain her grades and focus on her education.

    c. **MINOR DOE** has panic attacks, nightmares, PTSD, depression with suicidal ideation, anxiety, guilt, shame, social withdrawal, loss of trust, and a lost sense of personal safety.

    d. **MOTHER DOE** has PTSD, anxiety, guilt, and insomnia. She gets tearful and physically ill every time she has to deal with this -- which is daily.

553. **LYFT** *knew* it had a systemic problem with unaccompanied minors using the platform and, adults using the platform to entice, traffic, groom or abduct children.

554. **LYFT** also knew it had a problem with people using false names to hide their identity when ordering a **LYFT** ride for someone else.

555. **LYFT**'s reckless and negligent conduct includes, but is not limited to:

   a.  failure to enforce its policies to refuse rides for unaccompanied minors;

   b.  failure to implement age verification for riders;

   c.  allowing untrained drivers to access the **LYFT** platform and provide rides;

   d.  failing to require drivers to report suspicious activity to legal authorities;

   e.  failure to prevent, detect and shut down fake accounts and rider profiles;

   f.  failure to take reasonable remedial measures following multiple of reports sexual predators using the LYFT platform to traffic minor victims;

   g.  failure to monitor rides;

   h.  knowingly penalizing drivers who report underage riders;

556. Plaintiffs were in the zone of danger created by **LYFT**'s actions and inactions.

557. Specifically, **MINOR DOE** falls into a protected category under **LYFT**'s own policies.

558. The assailant never could have hailed a ride for **MINOR DOE**, if **LYFT** enforced its own policy against fake rider accounts, and this incident would have never happened.

559. **MINOR DOE** never would have been transported to a convicted sex offender if **LYFT** enforced its own policy to refuse rides for unaccompanied minors.

560. As a direct and proximate result of **LYFT**'s actions and inactions, Plaintiff suffered injuries, damages, and losses, as set forth herein.

561. The injuries sustained by victims of sexual assault are well understood and foreseeable and are even laid by out by one of **LYFT**'s "advisors", RAINN. https://rainn.org/effects-sexual-violence, including but not limited to:

   a.  Post Traumatic Stress Disorder;

   b.  Flashbacks;

   c.  Dissociation;

   d.  Panic Attacks;

   e.  Sleep Disorders;

    f.   Suicidal Ideation;

    g.   Guilt, Shame and Anxiety;

    h.   Loss of Trust;

    i.   Loss of Sense of Personal Safety;

    j.   Damage to Relationships; and

    k.   Impaired Focus and Concentration.

562. Plaintiffs bring this claim in good faith and believe under current law Plaintiffs have a cognizable claim under current law against **LYFT** under these facts.  Plaintiffs, in good faith believe that Colorado law should recognize such a duty under these circumstances as contemplated in C.R.S. §13-17-102(7) and 13-17-201(2).

563. Plaintiffs reserve the right to amend their complaint as new information becomes available through the discovery process.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs **MINOR DOE** and **MOTHER DOE** pray for Judgment against Defendants, **META, INSTAGRAM** and **LYFT** for relief in amounts to be determined at trial, as follows:

1. Economic damages, including, but not limited to, past and future medical, counseling and rehabilitation expenses, and out-of-pocket expenses from each Defendant and for each Plaintiff;

2. Non-economic damages, including, but not limited to, past and future physical pain and suffering, inconvenience, mental anguish, emotional distress, and loss of quality of life from       each       Defendant       for       each       Plaintiff;

3. Immediate commitment and follow-through by Defendant **INSTAGRAM** to implement such changes as are necessary to prevent the continued exploitation of minors on their platform.

4. Immediate commitment and follow-through by Defendant **LYFT**, Inc. to implement such changes as are necessary to prevent sexual assault on their passengers, with an emphasis on protecting minors, and stop the easy ability to be able to bypass **LYFT**'s minor's policy.

5. All other compensatory damages caused by the Defendants' actions, inactions, and conduct, to be proven at trial by each Defendant for each Plaintiff;

6. Pre-judgment and post-judgment interest as provided for by law for each Plaintiff;

7. Attorney fees, costs, and expenses of this action as provided for by law for each Plaintiff; and

8. For such other and further relief as the Court deems just, reasonable, and proper.

### **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so

triable. Respectfully submitted this 23rd day of December 2025.

**BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.**
*(Original signature on file at Burg Simpson Eldredge Hersh & Jardine, P.C.)*


*/s/ Morgan L. Carroll*
    David K. TeSelle, Reg. No. 29648
    Stephen J. Burg, Reg. No. 36789
    Morgan L. Carroll, Reg. No. 31941
    Jessica B. Prochaska, Reg. No. 46319
    Halli E. Berrebbi, Reg. No. 62383